*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0273p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

JASON GETSY,

*Petitioner-Appellant,*

*v.*

No. 03-3200

BETTY MITCHELL, Warden,

*Respondent-Appellee.*

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-00380—Dan A. Polster, District Judge.

Argued: December 6, 2005

Decided and Filed: August 2, 2006

Before: MERRITT, MOORE, and GILMAN, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Michael J. Benza, Cleveland, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, CAPITAL CRIMES SECTION, Cleveland, Ohio, for Appellee. **ON BRIEF:** Michael J. Benza, Cleveland, Ohio, David C. Stebbins, Columbus, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, CAPITAL CRIMES SECTION, Cleveland, Ohio, for Appellee.

MERRITT, J., delivered the opinion of the court, in which MOORE, J., joined. GILMAN, J. (pp. 21-35), delivered a separate dissenting opinion.

───────────────

**OPINION**

───────────────

MERRITT, Circuit Judge. We hold that the death sentence in this case violates the Eighth Amendment "arbitrariness" standard outlined in *Furman v. Georgia*, 408 U.S. 238 (1972), which prohibits random, disproportionate capital sentences, as well as the proportionality requirement of *Enmund v. Florida*, 458 U.S. 782 (1982), and the due process, inconsistent verdict prohibition of *Morrison v. California*, 291 U.S. 82 (1934).

This is a contract murder case with irreconcilable jury verdicts leading one defendant to be sentenced to death and another -- the defendant who initiated, contracted for, and paid for the murder -- to be sentenced to life imprisonment. Four defendants, Jason Getsy, Richard McNulty, Ben Hudach, and John Santine, were charged with committing the murder of Ann Serafino and the

1

attempted murder of Charles ("Chuckie") Serafino "for hire." Santine was charged with hiring the other three defendants to kill Chuckie Serafino, a business rival. Santine was sentenced to life imprisonment when a jury found him guilty of aggravated murder but not guilty of hiring Getsy to commit the murder. McNulty and Hudach were sentenced to life imprisonment after they were allowed to plead guilty. A jury found only nineteen-year-old Getsy guilty of the crime of murder for hire initiated by Santine and sentenced him to death. The Supreme Court of Ohio allowed Getsy's death sentence to stand, but expressed its dismay about the disproportionate nature of these inconsistent results:

> That Hudach received a lesser penalty than Getsy is not surprising -- Hudach did not enter the Serafino home. McNulty did, and he shot one of the victims; nevertheless, he was offered a plea bargain, Getsy was not. Furthermore, McNulty did not testify against Getsy; therefore, McNulty's case was not a case of the state's needing to secure testimony to obtain a conviction on a more culpable person.

> It is also troubling that Santine did not receive the death sentence even though he initiated the crime. If not for John Santine, it is unlikely the Serafinos would have been shot.

*State v. Getsy*, 702 N.E.2d 866, 892 (Ohio 1998). We agree with the Ohio Supreme Court's suggestion that Santine is probably more -- certainly no less -- culpable than Getsy, the young boy he hired, but we do not agree that the death verdict can stand. As explained below, the death sentence violates *Furman*, *Enmund*, and *Morrison* because like crimes are not being punished alike in the very same case and because of the inconsistent jury verdicts in this case. We also remand the case to the district court for an evidentiary hearing on Getsy's claim of judicial bias in his case.

## I. Background

The facts of this case, set forth below, are excerpted from *State v. Getsy*, 702 N.E.2d 866, 873-75 (Ohio 1998):

> Charles ("Chuckie") Serafino lived with his mother, Ann Serafino. On the evening of July 6, 1995, Ann went to bed at approximately 11:00 p.m. Chuckie was on the love seat in the family room when, sometime after 1:00 a.m. on July 7, he heard a loud explosion. Shells from a shotgun blasted out the sliding glass door behind him and wounded him in the arm. As he ran for the bathroom to inspect his injuries, Ann came out of her bedroom. Chuckie remembered hearing his mother say to someone, "What are you doing here? Get out of here." He also remembered hearing someone say, "Shoot the bitch," or "Kill the bitch." Serafino next recalled seeing a gun in his face and being shot again. He fell to the bathroom floor and pretended to be dead. After the intruders left, he called 911. . . .

> Earlier in the year, [John] Santine had attempted to purchase a portion of Chuckie Serafino's lawn-care business and had deposited $2,500 in the business's account. Subsequently, Chuckie violated probation and was incarcerated in the Trumbull County Jail until July 6, 1995. While Chuckie was in jail, Santine attempted to take over Chuckie's business. Santine transferred Chuckie's building lease and equipment into his own name, which caused an altercation between Santine and Ann Serafino and Chuckie's sister. The Serafinos filed a civil action against Santine while Chuckie was still in jail.

> [After the shootings, Officer] Forgacs [of the city of Hubbard Police Department] searched for Santine's car because of a conversation he had had on June 20, 1995 with Richard McNulty. McNulty, who lived at 24 ½ South Main and who is a co-

defendant, had previously served as a police informant. On June 20, Forgacs asked McNulty, who worked for Santine, "What does Johnny have in store for Chuckie when he gets out of jail?" McNulty told Forgacs, "He's dead. He's bought and paid for." McNulty told Forgacs that Santine had lined up a hit man, Tony Antone, to kill Chuckie Serafino. Forgacs gave little credence to McNulty's statements, and didn't inform Chuckie or follow up on the information. . . .

Initially, McNulty minimized his involvement and denied that he had told Forgacs about the contract on Chuckie. Based on other information obtained from McNulty, Begeot obtained an arrest warrant for Getsy. At approximately 10:00 p.m. on July 7, 1995, Getsy was arrested in the driveway of 24 ½ South Main. He was given *Miranda* warnings at the scene and later at the Hubbard Township Police Department. At approximately 1:00 a.m., on July 8, 1995, Getsy gave a videotaped interview.

Getsy told Begeot that Ben Hudach called him on the evening of July 6, 1995, and told him to come to 24 ½ South Main Street. When Getsy got there, Hudach, a co-defendant, told Getsy that they (Getsy, Hudach, and McNulty) had to "take out some guy." Santine was not present, but Hudach related what Santine had told him earlier. Money had been discussed, but Hudach was not sure of the amount. Getsy later indicated that he participated in the shootings because he was scared of Santine, but did not do it for the money.

Sometime on July 6, 1995, Getsy, Hudach, and McNulty drove to the Serafino residence. They could not find a place to park so they returned to 24 ½ South Main Street. When they returned, Santine was at the apartment and drove them back to the Serafino house. Getsy described the guns that they took with them, which included a shotgun, a SKS rifle, and a .357 magnum handgun.

Getsy explained that after Santine dropped them off, Hudach sprained his ankle and went back to where they were supposed to be picked up. Getsy stated, "[T]hat left me and Rick to get it done." He admitted that what they were supposed to do was kill Chuckie Serafino.

Getsy explained that he and McNulty fired simultaneously through the sliding glass door on the back of the Serafino house. They entered the house through the shattered door and shot at Chuckie as he was running down the hall. When they saw Ann Serafino, Getsy stated, they "just kept shooting."

During the interview with Begeot, Getsy was reluctant to mention Santine's name. He told Begeot that the same thing that happened last night could happen to him. He asked whether Santine would ever see the interview tape. Begeot assured Getsy that Santine would not be able to get to him. Getsy also asked Begeot if he was going to die, and Begeot told him, "No."

Getsy admitted that he had the SKS rifle and the handgun during the shootings. He explained that when he was shooting the SKS, the clip fell out so he had to pull out the handgun. . . .

After the shootings, Hudach called Santine to tell him it was finished and to pick them up. Santine told Hudach that there were cops everywhere and that they should run through the woods to get back to the apartment. Santine also told Hudach to ditch the guns in the woods.

Getsy, McNulty, and Hudach arrived back at 24 ½ South Main, where Josh Koch and Santine were waiting for them. Santine ordered them to take off their clothes and take a bath. Getsy was the last to bathe. When he came out of the bathroom, his clothes and boots were gone. He did not know what happened to them.

Koch testified that he was at 24 ½ South Main Street on July 6 and 7, 1995. He knew that Getsy, McNulty, and Hudach were going out to do something for Santine, but they declined to give him any details. He was to watch TV and write down the shows that were on so the other three could memorize the list for an alibi.

After Getsy, McNulty, and Hudach left, Koch waited in the apartment. Santine came to the apartment and, sometime around 1:00 a.m., jumped up and said, "I heard the gunshots." Immediately thereafter, the telephone rang and Koch heard Santine talking to someone in a fast, excited manner. Santine said, "So you killed them, right, you killed them both? . . . Okay. Well, I can't come pick you up. The cops are everywhere, they are pulling over everybody, you got to run through the woods and ditch the guns." Santine hung up and happily screamed, "I fucking love these guys."

According to Koch, Santine was very pleased with the three men. He said, "You guys want $10,000? I'll give you $10,000." McNulty told him he just wanted a wedding ring for his girlfriend. Hudach said that it had been a favor for Santine. Getsy indicated that he needed money for his car.

The next day, Koch heard Getsy bragging to Patricia Lawson about shooting Ann Serafino. Getsy grabbed a piece of pizza with no cheese on it and said, "This looks just like this bitch's face after we shot her."

Based on these facts, the Trumbull County Grand Jury returned a five-count indictment against Getsy on July 17, 1995. The indictment charged Getsy with the aggravated murder of Ann Serafino with prior calculation and design in violation of Ohio Rev. Code Ann. § 2903.01(A). That count included three death penalty specifications: (1) the aggravated murder was committed in conjunction with the purposeful killing of or attempt to kill two or more persons, Ohio Rev. Code Ann. § 2929.04(A)(5); (2) murder for hire, Ohio Rev. Code Ann. § 2929.04(A)(2); and (3) felony murder, Ohio Rev. Code Ann. § 2929.04(A)(7). On August 5, 1996, Getsy proceeded to a jury trial before the Trumbull County Court of Common Pleas. The jury returned verdicts finding Getsy guilty on all counts and specifications; thereafter, the prosecution dismissed the conspiracy count. Following a mitigation hearing under Ohio Rev. Code Ann. §§ 2929.022(A), 2929.03, and on September 10, 1996, the jury recommended that the death penalty be imposed on Getsy. Two days later, the trial court accepted the jury's recommendation and imposed a death sentence for the charge of aggravated murder. The defendant appealed to the Ohio Supreme Court, which affirmed his conviction and sentence. *State v. Getsy*, 702 N.E.2d 866, 893 (Ohio 1998).

Getsy filed a petition pursuant to 28 U.S.C. § 2254 in February 2001 after exhausting his state remedies. Getsy raised twenty-one claims of error, two of which the district court dismissed as procedurally defaulted. The district court determined that Getsy's remaining claims were without merit and dismissed the petition. Getsy now appeals from the district court's order dismissing his habeas corpus petition.

## II. Standard of Review

In determining whether to issue a writ of habeas corpus, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) govern our review of a state court judgment. 28 U.S.C. § 2241, *amended by* Pub. L. No. 109-163, § 373, 119 Stat. 3136 (2006). Pursuant to AEDPA, an Article III court can grant the writ of habeas corpus where the state court judgment was

"contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

The Supreme Court has defined "clearly established law" as "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000).  For purposes of § 2254(d)(1), an explicit statement of a particular rule by the Supreme Court is not necessary; rather, "[t]he Court has made clear that its relevant precedents include not only bright-line rules but also the legal principles and standards flowing from precedent." *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) (quoting *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)).  A state court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *(Terry) Williams*, 529 U.S. at 405-06.  A state court decision is an "unreasonable application of" clearly established Federal law "if the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407.

The Supreme Court has adopted the spectrum of abstraction of *Teague v. Lane*, 489 U.S. 288 (1989), to determine whether a particular legal principle was clearly established at the relevant time. *See (Terry) Williams*, 529 U.S. at 412 (With the caveat that the source of clearly established law is Supreme Court jurisprudence, "whatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1).").  At one end of the spectrum lie legal principles with such a high level of generality that their application does not necessarily lead to a "predictable development" in the relevant law and therefore cannot be considered clearly established.  *See Sawyer v. Smith*, 497 U.S. 227, 236 (1990).  On the other end are narrowly drawn bright-line rules with little application beyond factually indistinguishable cases.  In the middle of the spectrum lie those general principles of law crafted by the Supreme Court to constitute clearly established law in a wide range of factual situations.  It was the middle of the spectrum that Justice Kennedy described while concurring in *Wright v. West*, 505 U.S. 277, 308-09 (1992):

> If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule . . . .  Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.

A majority of the Supreme Court has adopted Justice Kennedy's "case-by-case" approach.  *See (Terry) Williams*, 529 U.S. at 391 ("That the *Strickland* test 'of necessity requires a case-by-case examination of the evidence' obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by this Court.") (citations omitted); *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 2471 (2005) (O'Connor, J., concurring) (noting the "'case-by-case examination of the evidence' called for under our cases"); *(Terry) Williams*, 529 U.S. at 382 (Stevens, J., dissenting in part) ("In the context of this case, we also note that, as our precedent interpreting *Teague* has demonstrated, rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule.").

The *Furman* arbitrariness principle, as supplemented by the rules against disproportionate sentences and irreconcilable jury verdicts in the same case (discussed below), falls well within the middle of *Teague*'s spectrum of abstraction, in that these principles provide sufficient content for predictable legal development and apply to a range of factual situations.  *See Gregg v. Georgia*, 428

U.S. 153, 195 (1976) (noting that "each distinct [sentencing] system must be examined on an individual basis" to determine if it satisfies the concerns of *Furman*). The *Furman* principle of general application interpreting the Eighth Amendment has been clearly established since 1972, decades before the state judgment at issue here. Moreover, the arbitrariness principle clearly applies here because the inconsistent verdicts and the resulting disproportionate sentences in this case are exactly the sort of unconstitutionally arbitrary and capricious outcomes that *Furman* and its progeny condemned.

### III. Constitutionality of Death Sentence

Getsy contends that his sentence of death was imposed in an arbitrary and capricious manner in violation of the Eighth Amendment of the United States Constitution because Santine, who initiated, contracted for, and paid for the murder, was acquitted of murder for hire and sentenced to life imprisonment. Relying on *Furman v. Georgia*, 408 U.S. 238 (1972), Getsy claims that the Ohio Supreme Court's rejection of his Eighth Amendment argument was "contrary to" relevant Supreme Court precedent. We hold that the "arbitrariness" principle firmly established in *Furman* and its progeny would be offended if the irreconcilable, arbitrary jury verdicts in this case were allowed to stand. We, therefore, conclude that Getsy's death sentence must be vacated.

### A. *Furman* Principles

The Supreme Court has clearly established that the Cruel and Unusual Punishments Clause of the Eighth Amendment condemns "the arbitrary infliction" of the death penalty. *Furman*, 408 U.S. at 274 (Brennan, J., concurring). In *Furman v. Georgia*, the Supreme Court, in a one paragraph per curiam opinion, held that the death penalty, as then administered under statutes vesting unguided sentencing discretion in juries and trial judges, was unconstitutionally cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *Id.* at 239-40. The concurring opinions that followed explained that the death penalty was being imposed so discriminatorily, *id.* at 240 (Douglas, J., concurring), so wantonly and freakishly, *id.* at 306 (Stewart, J., concurring), and so infrequently, *id.* at 310 (White, J., concurring), that any given death sentence was unconstitutionally cruel and unusual. Justice White concluded that "the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Id.* at 313 (concurring). Indeed, the death sentences examined by the Supreme Court in *Furman* were "cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of [capital crimes], many just as reprehensible as these, the petitioners [in *Furman* were] among a capriciously selected random handful upon whom the sentence of death ha[d] in fact been imposed." *Id.* at 309-10 (Stewart, J., concurring). Thus, *Furman* established that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this penalty to be arbitrarily and capriciously imposed. *See id.* at 310; *Spaziano v. Florida*, 468 U.S. 447, 460 (1984) (*Furman* established that "[i]f a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (*Furman* established that "if a State wishes to authorize capital punishment it has a constitutional responsibility to . . . apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.").

As it has evolved since *Furman*, the Eighth Amendment arbitrariness standard generally prohibits the infliction of a death sentence discriminatorily on the basis of illegitimate and suspect factors, such as the race or socioeconomic status of the defendant and the victim, and its inconsistent or random imposition. *See Eddings v. Oklahoma*, 455 U.S. 104, 111 (1982) (Beginning with *Furman*, the Court has emphasized its pursuit of the "goals of measured, consistent application and fairness to the accused."); David C. Baldus et al., *Arbitrariness and Discrimination in the*

*Administration of the Death Penalty: A Legal and Empirical Analysis of the Nebraska Experience (1973-1999)*, 81 Neb. L. Rev. 486, 496 (2002). The second source of arbitrariness, inconsistent and unprincipled outcomes, constituted a major factual foundation of the *Furman* holding. *See* Baldus et al., *supra*, at 496 n.5. The *Furman* Court invalidated existing death penalty laws because, as the laws were structured and administered at the time, they failed to generate acceptably consistent outcomes. *See Furman*, 408 U.S. at 295 (Brennan, J., concurring) (noting that the existing procedures were not constructed to guard against the totally arbitrary selection of offenders for the punishment of death); *Blystone v. Pennsylvania*, 494 U.S. 299, 303 (1990) (noting that the constitutional defect identified in *Furman* was that "unguided juries were imposing the death penalty in an inconsistent and random manner on defendants"). Each of the concurring opinions in *Furman* relied upon various forms of statistical evidence that purported to demonstrate patterns of inconsistent or otherwise arbitrary sentencing. *Furman*, 408 U.S. at 249-52 (Douglas, J., concurring); *id.* at 291-95 (Brennan, J., concurring); *id.* at 309-10 (Stewart, J., concurring); *id.* at 313 (White, J., concurring); *id.* at 364-66 (Marshall, J., concurring). Evidence of such inconsistent results, of sentencing decisions that could not be explained on the basis of individual culpability, indicated that the system operated arbitrarily and therefore violated the Eighth Amendment.

The Supreme Court has affirmed this conception of the Eighth Amendment in its decisions following *Furman*. Thus, the Court has insisted that "capital punishment be imposed fairly, and with reasonable consistency, or not at all." *Eddings*, 455 U.S. at 112. To satisfy the concerns of *Furman*, the Supreme Court has thereafter required that the sentencing body's discretion be "directed and limited" and exercised in an "informed manner" to avoid "wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). *Furman* was read as holding that "to minimize the risk that the death penalty [will] be imposed on a capriciously selected group of offenders, the decision to impose it ha[s] to be guided by standards so that the sentencing authority [will] focus on the particularized circumstances of the crime and the defendant." *Id.* at 199. The jury should be "given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." *Id.* at 192. "Otherwise, the system cannot function in a consistent and a rational manner." *Id.* at 189.

It is now well settled that "the penalty of death is different in kind from any other punishment imposed under our system of justice." *Id.* at 188. "From the point of view of the defendant, it is different both in its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action." *Gardner v. Florida*, 430 U.S. 349, 357 (1977). The qualitative difference of death from all other punishments requires a correspondingly greater need for reliability, consistency, and fairness in capital sentencing decisions. *See, e.g., Ford v. Wainwright*, 477 U.S. 399, 411 (1986); *Spaziano*, 468 U.S. at 460 n.7; *California v. Ramos*, 463 U.S. 992, 998-99 (1983); *Zant v. Stephens*, 462 U.S. 862, 884-85 (1983); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion. *Gardner*, 430 U.S. at 357. Accordingly, the courts must "carefully scrutinize" sentencing decisions "to minimize the risk that the penalty will be imposed in error or in an arbitrary and capricious manner. There must be a valid penological reason for choosing from among the many criminal defendants the few who are sentenced to death." *Spaziano*, 468 U.S. at 460 n.7. The death-is-different principle can only be observed here by holding that the inconsistent and disproportionate sentences in the same case violate the clearly established *Furman* arbitrariness principle and hence the Eighth Amendment.

### B. Disproportionality

*Proportionality* in sentencing is a major, independent element under the Eighth Amendment in assessing a death sentence. The comparative *disproportionality* between the culpability and sentences of Getsy and Santine demonstrates the arbitrariness of Getsy's death sentence. Unlike our

later discussion of inconsistent verdicts, which focuses on the *inconsistency* of only one codefendant being found guilty of murder for hire, a crime necessarily requiring at least two participants, this disproportionality problem was noted by the Ohio Supreme Court because Getsy had arguably less culpability than Santine, but received a harsher sentence, the death penalty, rather than Santine's life sentence:

> It is clear that Getsy would not have committed these crimes if he had never met Santine . . . .
>
> Santine was approximately thirty-five years old. Getsy was nineteen when the crimes were committed. Santine paid the rent for the apartment where Hudach and McNulty lived and supplied some of the drugs that they and their friends used. Santine bragged that he had connections with the mob and often spoke of his Mafia connections. When anyone in the group needed money, they asked Santine for it.
>
> Santine bragged that he had the police in his pocket . . . . Santine was known to have shot his own brother and apparently had never served time for the incident. Santine was known to routinely carry a duffel bag containing a gun. One time, Hudach and Robert Stoneburner were sitting with Santine when Santine shot a wall for no apparent reason. Santine commented that he wished it had been Chuckie (Serafino) . . . .
>
> It was clear from the videotape of his statement that Getsy feared Santine and was afraid that Santine would execute him. Getsy apparently was afraid to go to the police because Santine made it appear that he had the police in his pocket. This belief was supported by the fact that McNulty told police what Santine was planning and the police did nothing . . . .
>
> When the group first went to the Serafino house, they returned to the apartment without completing the act, using the excuse that they could not find a place to park. Santine became furious, eventually driving Getsy, McNulty, and Hudach back to the place himself . . . .
>
> It is also troubling that Santine did not receive the death sentence even though he initiated the crime. If not for John Santine, it is unlikely the Serafinos would have been shot.

*State v. Getsy*, 702 N.E.2d 866, 890-92 (Ohio 1998).

In evaluating whether a death sentence is arbitrary, the Supreme Court has directed courts to evaluate a defendant's culpability both individually and in terms of the sentences of codefendants and accomplices *in the same case*. *See Enmund v. Florida*, 458 U.S. 782, 788, 798 (1982). In *Enmund*, the Supreme Court found the Eighth Amendment violated when defendants with "plainly different" culpability received the same capital sentence. It requires proportionality comparison with others participating in the same crime:

> Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the Kerseys. This was impermissible under the Eighth Amendment.

*Id.* at 798.

The instant case presents the reverse situation where defendants with plainly similar culpability received different sentences; and, furthermore, the defendant with arguably the lesser culpability received the harsher sentence -- the death penalty. Numerous state courts have applied the *Enmund* principal to require reasonable symmetry between culpability and the sentencing of codefendants. *See, e.g., People v. Kliner*, 705 N.E.2d 850, 897 (Ill. 1998) ("[S]imilarly situated codefendants should not be given arbitrarily or unreasonably disparate sentences."); *Larzelere v. State*, 676 So. 2d 394, 406 (Fla. 1996) ("When a codefendant . . . is equally as culpable or more culpable than the defendant, disparate treatment of the codefendant may render the defendant's punishment disproportionate."); *Hall v. State*, 244 S.E.2d 833, 839 (Ga. 1978) ("We find that . . . the death sentence, imposed on Hall for the same crime in which the co-defendant triggerman received a life sentence, is disproportionate."). Similarly, the Federal Death Penalty Act recognizes that a comparison of the sentences received by equally culpable codefendants improves the likelihood that the death penalty will not be imposed in an arbitrary or capricious manner. *See* 18 U.S.C. § 3592(a)(4) (listing as a mitigating factor the lack of death sentences for equally or more culpable codefendants).

The principle requiring *proportionate punishment* has deep roots in our cultural and biological heritage. Aristotle observed in his *Nicomachean Ethics* almost 2,500 years ago that basic notions of justice require treating like cases alike:

> If, then, the unjust is unequal, the just is equal, as all men suppose it to be, even apart from argument . . . . This, then, is what the just is -- the proportional; the unjust is what violates the proportion . . . . [I]t is by proportionate requital that the city holds together.

Aristotle, *Ethica Nicomachea*, *in The Works of Aristotle* V.3.1131a-1131b, V.5.1132b (W.D. Ross ed. & trans., 1954); *see also* Aristotle, *The Politics of Aristotle* 129 (Ernest Barker ed. & trans., 1946) ("Justice is the political good. It involves equality, or the distribution of equal amounts to equal persons.").[1] Recent studies have reinforced this view. In a recent article, Judge Morris Hoffman and Timothy Goldsmith, a distinguished Yale biologist, make this point:

> [I]t is not surprising that collectively we struggle to balance the form and amount of punishment that is appropriate, a struggle that lies at the heart of what we mean by "justice." . . .
>
> The two faces of justice - to deal firmly with transgressors, but not too harshly - reflect an intrinsic human sense of fairness and are important to the political ideal of equality. When Aristotle commands that like cases be treated alike, he is touching both on the personal notion that none of us wants to be punished more than anyone else (and therefore on our self-interest) and on the social notion that none of us wants to punish others more than they deserve (and therefore on the equilibrium between our inclination to punish and our intuitions about fairness and sympathy). When sentencing guidelines address the tension between sentencing individual defendants and coordinating the sentences of similarly situated defendants, they are touching on this very same duality.

---

[1] Aristotle's view that "like cases should be treated alike" has long been a foundational principal in the U.S. legal system. *See, e.g.*, Jennifer B. Wriggins, *Torts, Race, and the Value of Injury, 1900-1949*, 49 How. L.J. 99, 101 n.10 (2005); Morris B. Hoffman, *The Case for Jury Sentencing*, 52 Duke L.J. 951, 1000 n.179 (2003); Catherine Weiss & Louise Melling, *The Legal Education of Twenty Women*, 40 Stan. L. Rev. 1299, 1347 n.120 (1988); Peter Westen, *The Empty Idea of Equality*, 95 Harv. L. Rev. 537, 543 n.20 (1982); *cf.* H.L.A. Hart, *The Concept of Law* 155 (1961) (deeming the phrase "[t]reat like cases alike" a "leading precept" of justice).

Morris B. Hoffman & Timothy H. Goldsmith, *The Biological Roots of Punishment*, 1 Ohio St. J. Crim. L. 627, 638-39 (2004). Coordination of sentences for the same crime is not simply a rational, legal principal but a deeply-held concept of justice as well.

The dissent argues incorrectly that the Supreme Court's decision in *Pulley v. Harris*, 465 U.S. 37 (1984), precludes our consideration of the "comparative proportionality" of sentences in this case.[2] *Pulley* simply held that the Eighth Amendment does not require a systematic comparative proportionality review of sentences in other unrelated cases. *Id.* at 50-51. *Pulley* concerned whether the Eighth Amendment mandates a *systematic* comparative proportionality review of a particular sentence to the punishment imposed on others for the same general type of crime but in unrelated cases. Our holding neither contradicts this rule nor implicates systematic comparative proportionality review. *Cf. People v. Bean*, 560 N.E.2d 258, 290 (Ill. 1990) ("[I]n reviewing the appropriateness of a death sentence, this court will examine the facts of that particular case and the evidence introduced at the trial and death penalty hearing, and, as a matter of reference, it may consider the sentence imposed on an accomplice or a co-defendant in light of his involvement in the offense."). Instead, we simply adhere to the clearly established principle of *Enmund* that, in a capital case with respect to the *very same* crime stemming from the *very same* facts, the Eighth Amendment does not permit codefendants with plainly similar culpability to receive different sentences -- especially when the defendant with arguably less culpability receives the harshest of all sentences, the death penalty. Following the dissent's view would not only conflict with the clear mandate of *Enmund* but would allow less culpable participants in the same criminal episode to receive the death penalty when the more culpable participant receives a lesser sentence.

In sum, sentencing Getsy to death, while the arguably more culpable Santine received a life sentence for the *very same* crime, violates the Eighth Amendment, as construed by the Supreme Court in *Furman* and *Enmund*, and its prohibition of arbitrary and disproportionate death sentences.

### C. Inconsistent Verdicts

The Supreme Court has declared that inconsistent verdicts are both scandalous and inequitable, *Richardson v. Marsh*, 481 U.S. 200, 210 (1987), and has accordingly indicated that inconsistent verdicts "constitute evidence of arbitrariness that would undermine confidence in the quality of the [jury's] conclusion," *Harris v. Rivera*, 454 U.S. 339, 346 (1981). In concluding that the inconsistent jury verdicts in this case evidences that Getsy's death sentence violates the Eighth Amendment arbitrariness principle outlined in *Furman*, we are informed by the common law rule of consistency, which was applied by the Supreme Court in *Morrison v. California*, 291 U.S. 82 (1934), and *Hartzel v. United States*, 322 U.S. 680 (1944). The common law rule of consistency prohibited a jury's acquittal of all but one of multiple defendants charged with jointly committing a crime that requires at least two participants. *E.g.*, *Iannelli v. United States*, 420 U.S. 770, 782 (1975) (listing conspiracy, adultery, incest, bigamy, and dueling as offenses that require the participation of two people); *Dunn v. United States*, 284 U.S. 390, 402 (1932) (Butler, J., dissenting) ("Upon the indictment of several for an offense that could not be committed without the

---

[2]The dissent also argues incorrectly that our consideration of the "comparative proportionality" of the sentences in this case is foreclosed by our precedents relying on *Pulley v. Harris*. *See, e.g., Williams v. Bagley*, 380 F.3d 932, 962-63 (6th Cir. 2004); *Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003); *Smith v. Mitchell*, 348 F.3d 177, 214 (6th Cir. 2003); *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003); *Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir. 2001). In each of these cases, we rejected claims regarding inadequate appellate review of the proportionality of death sentences, reasoning that the Constitution does not require the State to provide for a system of proportionality review. Our precedents interpret *Pulley* as holding that a *system* of comparative proportionality review is not constitutionally required, and the state therefore has "great latitude" in defining its system of proportionality review. *See Buell*, 274 F.3d at 369. Getsy's proportionality argument does not implicate our precedents relying on *Pulley* because Getsy does not challenge Ohio's system of proportionality review. Rather, Getsy challenges the imposition of disproportionate sentences for the *very same* crime stemming from the *very same* facts.

participation of two or more of them a verdict of guilty against one and of not guilty for the others, is deemed wholly repugnant and invalid.").

The principle against inconsistent verdicts was well established at common law when we adopted the Eighth Amendment. *Harison v. Errington*, 79 Eng. Rep. 1292 (K.B. 1627) (riot); *Marsh v. Vauhan*, 78 Eng. Rep. 937 (Q.B. 1599) (conspiracy).[3] The common law crime of riot provides a good example: "Under English law, that crime required three participants. It was legally impossible for fewer than three people to riot. Thus, if three defendants stood trial together for riot, and the jury convicted only one of them, this was a fatally inconsistent verdict, and the conviction could not stand." Eric L. Muller, *The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts*, 111 Harv. L. Rev. 771, 779 (1998) (citing *Harison*, 79 Eng. Rep. at 1293). "The argument was that as in conspiracy, if one only of two is found guilty the verdict is void 'for one alone cannot conspire.'" *Dir. Pub. Prosecutions v. Shannon*, [1975] A.C. 717, 723 (discussing *Harison*).

At common law, the rule of consistency was frequently applied to address inconsistent verdicts between two codefendants charged with conspiracy. The crime of conspiracy cannot be committed by an individual acting alone since, by definition, conspiracy requires an agreement between two or more people to commit some unlawful act. *Morrison*, 291 U.S. at 92. Thus, the rule of consistency invalidates the conviction of one conspirator when all the other alleged conspirators are acquitted of the conspiracy charge.[4] *See, e.g., United States v. Crayton*, 357 F.3d 560, 564 (6th

---

[3]The origins of the rule of consistency can be traced back more than four centuries to the case of *Marsh v. Vauhan*, 78 Eng. Rep. 937 (Q.B. 1599), in which two defendants were indicted and tried jointly for conspiracy, with the result that one was convicted and the other acquitted. The court quashed the lone defendant's conviction, reasoning in a one paragraph opinion that "one cannot conspire alone." *Id.* at 937. Subsequent decisions addressing irreconcilable or repugnant jury verdicts in conspiracy and other cases based on a criminal agreement between two parties adhered to the *Marsh* rule in quashing inconsistent verdicts. *See, e.g., R. v. Grimes*, 87 Eng. Rep. 142 (K.B. 1688); *R. v. Kinnersley*, 93 Eng. Rep. 467 (K.B. 1719); *R. v. Thompson*, 117 Eng. Rep. 1100 (Q.B. 1851).

[4]Some courts in non-death penalty cases have refused to apply the rule of consistency to inconsistent verdicts resulting from separate trials. *See United States v. Newton*, 389 F.3d 631, 636 (6th Cir.), *vacated in part on other grounds*, 126 S. Ct. 280 (2005); *United States v. Crayton*, 357 F.3d 560, 564 (6th Cir. 2004); *Cortis v. Kenney*, 995 F.2d 838, 840 (8th Cir. 1993); *United States v. Sachs*, 801 F.2d 839, 845 (6th Cir. 1986); *United States v. Lewis*, 716 F.2d 16, 22 (D.C. Cir. 1983); *United States v. Sangmeister*, 685 F.2d 1124, 1126-27 (9th Cir. 1982); *United States v. Espinosa-Cerpa*, 630 F.2d 328, 333 (5th Cir. 1980). These courts reason that "it is not necessarily inconsistent for two juries to reach differing results" because "different juries may hear different evidence." *Sachs*, 801 F.2d at 845. These courts also reason that application of the rule of consistency in this context "would be blatantly inconsistent with the Supreme Court's decision in *Standefer*." *See Espinosa-Cerpa*, 630 F.2d at 333.

In *Standefer v. United States*, 447 U.S. 10 (1980), the Supreme Court held that a defendant, who would have been an accessory at common law, may be convicted even though the named principal has been acquitted in a separate trial. The holding in *Standefer* rested on Congress's express intent to make those who were accessories at common law principal offenders, thereby permitting their indictment and conviction for the substantive offense. *Id.* at 19. Contrary to the reasoning of the courts refusing to apply the rule of consistency to inconsistent verdicts resulting from separate trials, neither *Standefer* nor any subsequent Supreme Court decision has proscribed application of the rule in this context.

The cases from the courts of appeals proscribing application of the rule of consistency to inconsistent verdicts resulting from separate trials were not capital cases. In refusing to apply the rule in this context, these cases protect the functions of the jury at the risk of disparate or arbitrary results. Such risk cannot be tolerated in a case in which the defendant's life is at stake. As the Supreme Court has often stated:

[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). It would be inconsistent with the heightened need for "reliability" in the capital sentencing decision to refuse to apply the rule of consistency.

Although this circuit has held that the rule of consistency does not apply to inconsistent verdicts resulting from separate trials in *conspiracy* cases, *see Newton*, 389 F.3d at 636; *Crayton*, 357 F.3d at 564; *Sachs*, 801 F.2d at 845, we have not extended this holding either to capital cases or to cases involving substantive crimes, such as adultery, incest, bigamy, dueling, or murder for hire, that necessarily involve at least two participants. The instant indictment charged

Cir. 2004); *United States v. Espinosa-Cerpa*, 630 F.2d 328, 331 (5th Cir. 1980); *Developments in the Law -- Criminal Conspiracy*, 72 Harv. L. Rev. 922, 972-73 (1959). The basis for the rule of consistency in conspiracy cases "is the notion that the acquittal of all but one potential conspirator negates the possibility of an agreement between the sole remaining defendant and one of those acquitted of the conspiracy and thereby denies, by definition, the existence of any conspiracy at all." *Espinosa-Cerpa*, 630 F.2d at 331. Under this reasoning, the conspiracy conviction of a lone defendant is invalid because "the verdict . . . itself den[ies] the existence of the essential facts." *United States v. Austin-Bagley Corp.*, 31 F.2d 229, 233 (2d Cir. 1929).

The Supreme Court has on at least two occasions applied the rule of consistency to set aside irreconcilable jury verdicts. In *Morrison v. California*, the Supreme Court held that the reversal of the conspiracy conviction of the defendant's sole alleged co-conspirator on constitutional grounds required reversal of the defendant's state conspiracy conviction. 291 U.S. at 93. In so holding, the Court stated:

> It is impossible in the nature of things for a man to conspire with himself. In California as elsewhere conspiracy imports a corrupt agreement between not less than two with guilty knowledge on the part of each . . . . The conviction failing as to the one defendant must fail as to the other.

*Id.* at 92-93 (citations omitted); *see also Gebardi v. United States*, 287 U.S. 112, 123 (1932) (reversing defendant's conviction of conspiracy to violate the Mann Act because his alleged co-conspirator was acquitted, and there was therefore "no proof that the man conspired with anyone else to bring about the transportation"). The Court went on to base its conclusion on the requirements of due process:

> [T]he conviction of Morrison because he failed to assume the burden of disproving a conspiracy was a denial of due process that vitiates the judgment as to him. Nor is that the only consequence. Doi was not a conspirator, however guilty his own state of mind, unless Morrison had shared in the guilty knowledge and design. . . . The conviction failing as to the one defendant must fail as to the other.

*Morrison*, 291 U.S. at 93 (citing *Turinetti v. United States*, 2 F.2d 15 (8th Cir. 1924)). In *Turinetti v. United States*, on which the Court relied, the court of appeals held that the release of one party to the agreement must lead to the acquittal of the second party:

> Therefore, since Turinetti could not have conspired with himself alone, he could not under the law be convicted of a conspiracy. It follows that there is no lawful way to avoid a reversal also as to Turinetti, although, under the evidence, he violated one or more provisions of the National Prohibition Act. For the latter violations, however, he was neither indicted nor convicted, and so the fact of such other violations will not warrant affirmance of this conviction for conspiracy.

2 F.2d at 17.

---

Getsy with conspiracy to murder, but he was not convicted of this count. He was convicted of murder for hire. This was a substantive offense. Conspiracy is separate from the substantive offense that is the object of the agreement. *United States v. Felix*, 503 U.S. 378, 389-90 (1992). The rule allowing inconsistent verdicts in conspiracy cases has not been applied and should not be applied to inconsistent verdicts on the substantive offense of murder for hire in the same case. The law has excused inconsistent verdicts in run-of-the-mill conspiracy cases, but it has not excused inconsistent verdicts on a substantive offense requiring the participation of two people. We should not start now to permit such arbitrary, inconsistent verdicts -- especially in a capital case.

Similarly, in *Hartzel v. United States*, 322 U.S. 680 (1944), the Supreme Court reversed a conspiracy conviction on the basis of inconsistency. Hartzel and two others were charged with violating and with conspiracy to violate the Espionage Act of 1917. The trial judge found the evidence insufficient to support the convictions of Hartzel's two alleged co-conspirators. *Id.* at 682 n.3. The Supreme Court concluded that the setting aside of Hartzel's only two co-conspirators' convictions "makes it impossible to sustain petitioner's conviction" for conspiracy to violate the Espionage Act. *Id.* Thus, *Morrison* and *Hartzel* now stand for the proposition that inconsistent or repugnant jury verdicts in conspiracy and other cases based on a criminal agreement between two parties cannot stand. This rule adds clarity, detail, and content to the more generalized "arbitrariness" language of *Furman* and mandates that Getsy's death sentence be vacated.

Although several courts of appeals have questioned whether *United States v. Powell*, 469 U.S. 57 (1984), overruled the rule of consistency, *see Crayton*, 357 F.3d at 564; *United States v. Acosta*, 17 F.3d 538, 545-46 (2d Cir. 1994); *United States v. Zuniga-Salinas*, 952 F.2d 876, 877-78 (5th Cir. 1992) (en banc); *United States v. Bucuvalas*, 909 F.2d 593, 594-97 (1st Cir. 1990); *United States v. Thomas*, 900 F.2d 37, 40 (4th Cir. 1990); *United States v. Dakins*, 872 F.2d 1061, 1065-66 (D.C. Cir. 1989); *United States v. Mancari*, 875 F.2d 103, 104 (7th Cir. 1989); *United States v. Andrews*, 850 F.2d 1557, 1561-62 (11th Cir. 1988); *United States v. Valles-Valencia*, 823 F.2d 381, 381-82 (9th Cir. 1987); *Gov't of the Virgin Islands v. Hoheb*, 777 F.2d 138, 142 n.6 (3d Cir. 1985), the Supreme Court has never expressly or even impliedly overruled the rule of consistency previously recognized by the Court in *Morrison* and *Hartzel*. As the Tenth Circuit has noted, the argument that the rule of consistency is no longer viable after *Powell* "is substantially undercut by the fact that the *Powell* opinion does not discuss *Hartzel* or expressly overturn the traditionally recognized exception." *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 475 (10th Cir. 1990).

Moreover, *Powell* did not concern or address inconsistent jury verdicts between two codefendants charged with conspiracy or participation in another similar criminal contract. The defendant in *Powell* was convicted of using the telephone to commit the crime of "conspiracy to possess with the intent to distribute and possession with intent to distribute cocaine," but she was acquitted of knowingly and intentionally possessing cocaine with intent to distribute. *Powell*, 469 U.S. at 59-60. She argued that the verdicts were inconsistent because proof that she had conspired to possess cocaine with intent to distribute, or had so possessed cocaine, was an element of the telephone facilitation count. *Id.* at 60. The Court reaffirmed the holding of *Dunn v. United States*, 284 U.S. 390 (1932), that "[c]onsistency in the verdict is not necessary." *Powell*, 469 U.S. at 62-63. In so holding, *Powell* simply precludes a reversal based on inconsistency between verdicts on separate charges against a single defendant. *Powell* did nothing, however, to eliminate the rule requiring reversal of irreconcilable verdicts where one defendant is acquitted and the other convicted of a crime that necessarily requires two people to participate in a criminal contract. *See Andrews*, 850 F.2d at 1570 (Clark, J., dissenting) ("I cannot agree that *Powell* should be expanded to let inconsistent conspiracy verdicts stand where one defendant is acquitted and the other convicted."). Because nothing in *Powell* purports to overrule *Morrison* and *Hartzel*, we will continue to follow the Supreme Court's directly applicable precedent and "leave to the Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

In coming to the foregoing conclusion, we are mindful that the dicta of *United States v. Newton* and *United States v. Crayton* states that the rule of consistency "has no continuing validity." *United States v. Newton*, 389 F.3d 631, 636 (6th Cir.), *vacated in part on other grounds*, 126 S. Ct. 280 (2005); *Crayton*, 357 F.3d at 564. However, both *Crayton* and *Newton* more narrowly hold that "an individual's conviction for conspiracy may stand, despite acquittal of other alleged coconspirators, when the indictment refers to unknown or unnamed conspirators and there is sufficient evidence to show the existence of a conspiracy between the convicted defendant and these other conspirators." *Crayton*, 357 F.3d at 567 (quoting *United States v. Anderson*, 76 F.3d 685, 688-89 (6th Cir. 1996)); *see Newton*, 389 F.3d at 636-37 (citing *Anderson*, 76 F.3d at 688-89). This

narrow holding was the only discussion necessary to resolve the case. As the preeminent legal scholar Karl Llewellyn said, there is a "distinction between the *ratio decidendi*, the Court's own version of the rule of the case, and the *true* rule of the case, what *it will be made to stand for by another later court*":

> For one of the vital elements of our doctrine of precedent is this: that any later court can always reexamine a prior case, and under the principle that the court could decide only what was before it, and that the older case must now be read with that in view, can arrive at the conclusion that the dispute before the earlier court was much narrower than that court thought it was, called therefore for the application of a much narrower rule. Indeed, the argument goes further. It goes on to state that no broader rule *could* have been laid down ex-cathedra, because to do that would transcend the powers of the earlier court.

Karl Llewellyn, *The Bramble Bush* 52 (1930). Or, as this Court recently said: "This Court considers as dicta any observation in the opinion of the court unnecessary to the holding in that case." *Peabody Coal Co. v. Director, Office of Workers' Comp. Programs*, 48 Fed. Appx. 140, 144 (6th Cir. 2002). Because *Crayton* and *Newton* were ultimately decided based on the rule of *United States v. Anderson*, the discussion of whether the rule of consistency is viable after *Powell* was unnecessary to the holding and therefore not binding on this Court.

Since we conclude that the Supreme Court has not overruled *Morrison* and *Hartzel*, the rule of consistency is applicable where, as in the instant case, a jury convicts only one of multiple defendants charged with committing the crime of murder for hire. Murder for hire requires at least two participants: the hiring party and the person hired. *See Ramsey v. Commonwealth*, 343 S.E.2d 465, 470 (Va. Ct. App. 1986) (noting that murder for hire "necessarily involve[s] at least two people"). An "essential element" of the crime of murder for hire is an agreement between the hiring party and the person hired that the latter will be compensated for his services. *State v. Carpenter*, 882 A.2d 604, 653 (Conn. 2005); *see Orsini v. State*, 665 S.W.2d 245, 253 (Ark. 1984) (To establish murder for hire, the government must prove that there was "an *agreement* to kill in exchange for something of value."); *State v. McGann*, 506 A.2d 109, 116 (Conn. 1986) (To establish a "hiring" relationship, the government must prove "the essential element of an *agreement* to compensate the [person hired] for his services."); *Commonwealth v. Gibbs*, 626 A.2d 133, 138 (Pa. 1993) (To establish murder for hire, the government must prove that the hiring party and the person hired "contracted to kill the victim."). Therefore, the acquittal of all but one defendant "negates the possibility of an agreement" to kill between the sole remaining defendant and one of those acquitted of the murder for hire and "thereby denies, by definition, the existence of" a "hiring" relationship. *See Espinosa-Cerpa*, 630 F.2d at 331. If the jury convicts only one of multiple defendants charged with the crime of murder for hire, this is a fatally inconsistent verdict requiring reversal.

Accordingly, the rule of consistency recognized in *Morrison* and *Hartzel* requires reversal of Getsy's murder for hire conviction and the resulting death sentence because the other necessary participant, the hiring party, was acquitted of the same murder for hire specification. The acquittal of Santine of murder for hire based on substantially the same evidence signifies that the jury found no contract to kill the Serafinos, and Getsy cannot have acted alone since murder for hire requires a plurality of actors. Getsy's murder for hire conviction is therefore irreconcilable with the jury verdict acquitting Santine of the same charge. As the Supreme Court established in *Morrison* and *Hartzel*, such an inconsistent verdict cannot stand. Moreover, the opinions in *Furman* rested upon a perception of just such inconsistency, *see Furman*, 408 U.S. at 309-10 (Stewart, J., concurring); *id.* at 313 (White, J., concurring), and the arbitrariness principle firmly established in *Furman* is offended by the irreconcilable jury verdicts in this case. Under these circumstances, the Ohio Supreme Court's decision affirming Getsy's death sentence without identifying or applying the

governing Eighth Amendment principles was "contrary to" the principles clearly established in *Furman*, *Morrison*, and *Hartzel*.[5]

## IV. Judicial Bias

Getsy claims that he did not receive a fair trial due to bias on the part of Judge McKay, the state court judge who presided over his trial. The bias charge stems from Judge McKay's attendance, during Getsy's trial, at an annual picnic hosted by Trumbull County judges at the home of Judge Ronald Rice's mother. The picnic was also attended by Cynthia Rice, the wife of Judge Rice and the assistant prosecuting attorney who was trying Getsy's case. Following the picnic, Judge McKay was involved in a single-car accident and was charged with driving under the influence of alcohol. The next day Judge McKay arrived for trial with bruises on his face and wearing sunglasses, and the trial continued without any mention of the incident. Although Judge McKay did not divulge the cause of his injuries to the parties, Getsy's counsel learned of the picnic, the accident, and the judge's arrest from local media coverage. Judge McKay was thereafter prosecuted by David P. Joyce, Prosecuting Attorney for Geauga County, acting as Special Prosecuting Attorney, and on September 5, 1996, Judge McKay pled guilty to driving under the influence of alcohol.

On August 26, 1996, Getsy filed a Motion for Mistrial and a Motion for Recusal in the trial court. He also filed an Affidavit of Disqualification against Judge McKay in the Supreme Court of Ohio pursuant to Ohio Rev. Code Ann. § 2701.03. The motions alleged that the judge was socializing with the assistant prosecutor, thereby giving the appearance of impropriety. Getsy also asserted that the jury might have perceived that Judge McKay was favorably disposed toward the prosecution both because the judge was socializing with the assistant prosecutor and because the judge was facing prosecution for driving under the influence. (J.A. at 516-23.)

On August 27, 1996, the Chief Justice of the Supreme Court of Ohio denied the Affidavit of Disqualification, stating:

> The mere fact that a judge and an attorney attend the same social event does not mandate the judge's disqualification from pending cases involving that attorney. . . . Moreover, I cannot conclude that Judge McKay had any duty to disclose his attendance at the event in question, either before or after the event, or that his nondisclosure was the product of any animosity or bias toward the defendant in this case. The record is devoid of any evidence that demonstrates the existence of any bias, prejudice, or disqualifying interest based on the claims of the affiants.

---

[5]Contrary to the dissent's characterization of our holding, we merely hold that the rule firmly established in *Morrison* and *Hartzel* provides compelling evidence of the arbitrariness of Getsy's death sentence. Our dissenting colleague concludes that these cases do not alter the conclusion that the rule of consistency did not survive *Powell*. In so concluding, our dissenting colleague fails to understand that *Morrison* and *Hartzel* are distinguishable from the line of cases regarding inconsistency between verdicts on separate charges against one defendant. It is true, as the dissent points out, that *Powell* and a number of earlier Supreme Court cases have held generally that inconsistency between verdicts returned as to a *single* defendant is insufficient reason to upset a conviction. However, none of these cases involved *multiple* defendants charged with jointly committing an offense, like conspiracy or murder for hire, that requires the participation of at least two parties in a criminal agreement. Because *Powell* did not even involve a criminal agreement between two parties, one of whom is acquitted of participation in the agreement, its holding does not affect the rule recognized in *Morrison* and *Hartzel*. *See Harris v. Rivera*, 454 U.S. 339, 345 n.13 (1981) (acknowledging the decision in *Hartzel* as distinguishable from the Supreme Court's cases with respect to inconsistency between verdicts on separate charges against one defendant). Thus, *Powell* does not mention or purport to change the doctrine of *Morrison* and *Hartzel* and the age-old common law rule to the same effect. We are at a loss to understand why our dissenting colleague strains so hard to get around applying the traditional doctrine -- especially in a capital case where life is at stake. Not only are we constitutionally bound to apply the *Morrison*/*Hartzel* doctrine, we are also statutorily bound under AEDPA.

*In re Disqualification of McKay*, 674 N.E.2d 359, 359 (Ohio 1996). The Chief Justice primarily relied on Judge McKay's affidavit, which indicated that any contact the judge had with the assistant prosecuting attorney at the picnic consisted of the "passing of simple social amenities." *Id.*

After the Chief Justice denied the application, Judge McKay brought in a fellow Trumbull County judge to voir dire the jurors regarding the media coverage of Judge McKay's arrest. Only two jurors had seen the newspaper articles about Judge McKay's accident and arrest, and both indicated that it would not affect their ability to be fair and impartial. Concluding that the jury had not been "impaired," Judge McKay then denied the Motion for Mistrial and the Motion for Recusal without a hearing.

The Due Process Clause of the Fourteenth Amendment requires that a defendant be afforded a "fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (citations omitted); *see In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases."). This Court has explained that "[i]f a habeas court determines that bias by a state judge resulted in a constitutional violation, then the court is required to overturn the state court decision." *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002). Further, this Court looks to "the Supreme Court's decision in [*Liteky v. United States*] to provide the standard for deciding judicial bias claims; in that case, the Court explained that 'the pejorative connotation of the terms 'bias' and 'prejudice' demands that they be applied only to judicial predispositions that go beyond what is normal and acceptable.'" *Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 552 (1994)). To state a due process claim of judicial bias, a "defendant must show either that actual bias existed, or that an appearance of bias created a conclusive presumption of actual bias." *United States v. Lowe*, 106 F.3d 1498, 1504 (10th Cir. 1997); *see also Anderson v. Sheppard*, 856 F.2d 741, 746 (6th Cir. 1988) ("[W]e require not only an absence of actual bias, but an absence of even the appearance of judicial bias.").

In order for us to evaluate whether Getsy was deprived of his right to a fair trial, we must know more about the extent of Judge McKay's contact with the assistant prosecutor and the effect of the judge's arrest and prosecution on his ability to be neutral. The record before us is inadequate for a meaningful review of Getsy's claim of judicial bias, and we, therefore, grant Getsy's request for an evidentiary hearing. AEDPA permits a district court to hold an evidentiary hearing in a habeas case only in limited circumstances. It provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --
>
> (A) the claim relies on --
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

Although the requirements of § 2254(e)(2) are onerous, "only a prisoner who has neglected his rights in state court need satisfy these conditions." *(Michael) Williams v. Taylor*, 529 U.S. 420,

435 (2000).[6] By the terms of its opening clause, § 2254(e)(2) applies only to prisoners who have "failed to develop the factual basis of a claim in State court proceedings." *Id.* at 430. If the prisoner has failed to develop the facts, "himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met." *Id.* at 437.

In determining whether the prisoner must satisfy the requirements of § 2254(e)(2), the question is not whether the petitioner has succeeded in developing the record, but whether the petitioner has diligently attempted to do so. In *(Michael) Williams v. Taylor*, the Supreme Court held that "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432. For purposes of § 2254(e)(2), diligence requires the prisoner to make "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* at 435. As the Supreme Court explained, "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

We conclude that Getsy made a reasonable attempt, in light of the information available at the time, to develop the factual basis of his judicial bias claim. In his Motion for Mistrial, Getsy requested that he be allowed to question "certain individuals," including Cynthia Rice and Judge McKay, about the contact between the judge and the assistant prosecutor. (J.A. at 518.) Getsy was not afforded the opportunity to examine the relevant witnesses. In his petition for post-conviction relief, Getsy sought discovery in support of his judicial bias claim, specifically requesting further information about the contact between the judge and the assistant prosecutor and about the effect of the incident on the jury. (J.A. at 1358.) The state court dismissed Getsy's petition without a hearing. (J.A. at 1424.) Getsy also repeatedly requested, and was denied, an evidentiary hearing in state court on the issue. Getsy's failure to develop the factual basis of his judicial bias claim was not due to a lack of diligence, and he therefore need not satisfy the requirements of § 2254(e)(2) with respect to this claim. Because Getsy never received an evidentiary hearing and consequently the record before us fails to clarify facts central to the determination of Getsy's claim of judicial bias, we remand for an evidentiary hearing on this claim.

---

[6]This case is not to be confused with the case *(Terry) Williams v. Taylor*, 529 U.S. 362 (2000), which also concerns the interpretation of certain provisions of § 2254, and which was decided on the same day (April 18, 2000).

## V. Other Issues

Because we are vacating Getsy's death sentence on Eighth Amendment grounds, we do not reach the alternative grounds raised by Getsy in the challenge to his death sentence, including ineffective assistance of counsel at the penalty phase, insufficient evidence to support the statutory aggravating circumstance of murder for hire,[7] and the cumulative effect of the errors.

Getsy also raises 3 other issues that he claims warrant a granting of the writ and a new trial: (1) Getsy's confession should not have been introduced at trial as it was not voluntarily given; (2) Getsy was denied the right to a fair and impartial jury drawn from a representative cross-section of the community; and (3) the State improperly singled Getsy out for prosecution and imposition of the death penalty.

### A. Introduction of Confession at Trial

Getsy was convicted in large part based on his videotaped confession to the police that he committed the murder of Ann Serafino and the attempted murder of Chuckie Serafino, which he made after he was arrested on July 7, 1995. Getsy argues that the waiver of his *Miranda* rights and his subsequent confession were not made voluntarily because he was in custody and deprived of food, rest, and the advice of counsel and family for an extended period of time. We do not have before us any question concerning whether Getsy's confession was unknowing and unintelligent. *See Colorado v. Spring*, 479 U.S. 564, 573 (1987) (explaining that claims regarding *Miranda* waivers must demonstrate not only that the confession was voluntary but also that the confession was knowing and intelligent).

The state court correctly noted that police overreaching is necessary for a confession to be found involuntary under the Due Process Clause of the Fourteenth Amendment. *See Colorado v. Connelly*, 479 U.S. 157, 164 (1986); *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005). In *Colorado v. Connelly*, the defendant had approached a police officer and insisted on confessing to a murder committed a year earlier. The defendant was later diagnosed as suffering from schizophrenia, which interfered with his ability to make free and rational choices. The Supreme Court held that the defendant's deficient mental condition was not a sufficient basis from which to find that the defendant's confession was involuntary. Rather, the Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167.

Getsy has not demonstrated that there was police overreaching in his case. Getsy was arrested at around 10:00 p.m. on July 7, 1995, transported to the Hubbard Township Police Station, and apprised of his *Miranda* rights. Fewer than three hours later, Getsy waived his *Miranda* rights and confessed to the murder. The interview itself was of relatively short duration, lasting less than one hour. During the interview, Getsy was not subjected to any threats or physical deprivation. Getsy did not asked the police for food or an opportunity to rest, and they did not deny either to him.

---

[7]When reviewing a defendant's conviction, our concerns about double jeopardy inform the general rule that we must consider a sufficiency of the evidence challenge to a conviction first when that issue is raised. *See United States v. Aarons*, 718 F.2d 188, 189 n.1 (6th Cir. 1983) ("Where the sufficiency of the evidence is properly before us, we consider that issue first because it is determinative of whether the appellant may be retried."); *Delk v. Atkinson*, 665 F.2d 90, 93 n.1 (6th Cir. 1981) ("Several courts including this one have indicated that where it is claimed on appeal from a federal conviction that the evidence was insufficient, the reviewing court is required to decide the sufficiency question even though there might be other grounds for reversal which would not preclude retrial."); *United States v. Orrico*, 599 F.2d 113, 116 (6th Cir. 1979) ("We decide the issue of sufficiency of the evidence, rather than admissibility, because the former issue is determinative of the question whether [the defendant] may be retried."). In these circumstances, however, we need not reach Getsy's sufficiency of the evidence claim because our rule of consistency holding means that Getsy cannot face retrial on the murder for hire specification.

Although the transcript of Getsy's statement reveals that he was frightened, he was frightened of Santine, not of the police officers questioning him. Although the transcript shows that the police assured Getsy that Santine would not harm him, Getsy did not offer any evidence to show that these assurances impacted his decision to give his post-arrest confession. Thus, there is no merit to Getsy's argument that his confession was involuntary or unconstitutionally admitted.

### B. Fair and Impartial Jury

In this claim, Getsy argues that his jury was not fair and impartial because: (1) pretrial publicity infected the jury pool; (2) the trial court improperly limited voir dire; (3) the trial court failed to remove for cause  jurors who stated that they would automatically impose a death sentence upon a conviction; and (4) prospective jurors were asked to commit themselves to imposing the death penalty. Contrary to Getsy's contention, nothing in the record establishes that Getsy was denied the right to a fair and impartial jury. A review of the transcripts of the voir dire reveals that the court questioned prospective jurors about their exposure to pretrial publicity and excused all jurors who indicated that they could not be impartial; the trial court did not unreasonably or arbitrarily restrict the questioning of potential jurors during voir dire; the three jurors who Getsy asserts would automatically vote to impose the death penalty indicated that they could consider all available options; and neither the trial court nor the prosecutor sought commitments from prospective jurors to impose the death penalty.

Getsy also contends that his jury was not fair and impartial because the trial court improperly excused for cause three jurors who expressed opposition to the death penalty. The state court properly applied the standard established in *Wainwright v. Witt*, 469 U.S. 412 (1985), for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424. The Ohio Supreme Court specifically adopted the *Witt* standard in *State v. Rogers*, 478 N.E.2d 984, 989 (Ohio 1985), *vacated on other grounds by* 474 U.S. 1002 (1985), and Ohio Rev. Code Ann. § 2945.25(C)[8] does not impose a higher standard than that set forth in *Witt*, *see State v. Roe*, 535 N.E.2d 1351, 1357 (Ohio 1989); *State v. Frazier*, 652 N.E.2d 1000, 1007 (Ohio 1995). The record reveals that Juror Nos. 107, 140, and 185 were properly excluded under the standard set forth in *Witt* because, although these jurors equivocated in their answers, all three indicated that they could not follow the law and impose the death sentence, even if appropriate. (J.A. at 3008, 3133, 3332.)

### C. Selective Prosecution

Getsy contends that the State improperly engaged in selective prosecution by seeking the death penalty for him and not for his three codefendants. To support his claim of selective prosecution, Getsy bears the "heavy burden" of establishing "that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the

---

[8] Section 2945.25 provides, in relevant part:

A person called as a juror in a criminal case may be challenged for the following causes:

* * *

(C) In the trial of a capital offense, that he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case. A prospective juror's conscientious or religious opposition to the death penalty in and of itself is not grounds for a challenge for cause. All parties shall be given wide latitude in voir dire questioning in this regard.

charge against him, he has been singled out for prosecution." *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974). He must also demonstrate "that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Id.*

We agree with the Ohio Supreme Court and the district court that this claim is unsupported by the record. It appears from the record that the codefendants in this case were similarly charged with the aggravated murder of Ann Serafino, with three death penalty specifications: (1) the aggravated murder was committed in conjunction with the purposeful killing of or attempt to kill two or more persons; (2) murder for hire; and (3) felony murder. The fact that two of the codefendants were offered a plea agreement in which the death penalty specifications were dismissed, and that a jury acquitted one codefendant of the death penalty specifications does not indicate that Getsy was selectively prosecuted. Further, nothing in the record suggests that the offer of a plea bargain to Hudach and McNulty or the lack of an offer to Getsy was based upon improper motives. The record is thus clear that Getsy cannot establish that he was singled out for prosecution.

## VI. Conclusion

We hold that Getsy's death sentence violates *Furman*, *Enmund*, and *Morrison* in that its imposition is arbitrary and disproportionate and results in inconsistent verdicts. We, therefore, reverse and vacate the judgment insofar as it leaves undisturbed the death sentence imposed. The State is granted 180 days after the judgment in this case becomes final in the federal judicial system to reconsider in light of this opinion Getsy's sentence under Ohio law. We also remand the case for an evidentiary hearing regarding the claim of judicial bias and for further proceedings not inconsistent with this opinion.

---

**DISSENT**

---

RONALD LEE GILMAN, Circuit Judge, dissenting. In setting aside the death sentence imposed upon Jason Gesty for the murder of Ann Serafino, the majority today reaches beyond the arguments advanced by Getsy and announces a new rule of constitutional law. The majority holds that the Eighth Amendment and the common-law rule of consistency require us to invalidate Getsy's death sentence because a different jury failed to find the murder-for-hire specification at the later trial of the man who enlisted Getsy as the hired killer. In other words, because John Santine did not receive the death penalty, neither can Getsy.

Binding precedent from both the Supreme Court and this court indicates that neither the Constitution nor the federal common law contains any such rule. *See McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987) (rejecting the argument that the defendant could "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty") (emphasis in original); *United States v. Crayton*, 357 F.3d 560, 565 (6th Cir. 2004) (holding that the common-law "rule of consistency [is] no longer good law"). Instead of following these binding precedents, the majority "breaks new ground" in this case, contrary to the Supreme Court's decision in *Teague v. Lane*, 489 U.S. 288, 301 (1989), which generally bars federal courts from applying new rules of constitutional law in habeas corpus proceedings.

The majority also circumvents the other principal limitation on a federal court's power to grant relief from a state-court judgment—namely, 28 U.S.C. § 2254(d)(1), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). I cannot join the majority in sidestepping these important limitations on federal judicial power in order to (1) endorse and apply a type of proportionality review never required by the Supreme Court, and (2) to resurrect and expand the discredited common-law rule of consistency, which the habeas petitioner himself understandably chose not to invoke. *See Keeton v. Flying J, Inc.*, 429 F.3d 259, 274 (6th Cir. 2005) (Gilman, J., dissenting) ("Judicial restraint . . . cautions against adopting a position whose merits have not been advocated even by the party seeking relief.").

In addition to vacating Getsy's sentence, the majority calls into question the validity of his underlying murder conviction by granting him an evidentiary hearing to explore charges of bias against the state-court trial judge. This issue was thoroughly examined by the state courts of Ohio, and I see no constitutional defect in their rejection of Getsy's claim of judicial bias. Furthermore, by granting relief on both Getsy's challenge to his sentence and his attack on his underlying conviction, the majority has placed the state in an inextricable quandary—one in which it has only 180 days to somehow cure what the majority believes to an unconstitutional sentence, even though Getsy's entire conviction could eventually be invalidated on the ground of judicial bias.

Because I am convinced that the district court properly applied governing constitutional and statutory standards in its comprehensive 132-page opinion denying Getsy's habeas petition, I would affirm the decision below in its entirety. I therefore respectfully dissent.

## I. THE MAJORITY'S NEW RULE OF CONSTITUTIONAL LAW

Relying on both the proportionality requirement of the Eighth Amendment and the common-law rule of consistency, the majority holds that Getsy's death sentence must be reversed "because the other necessary participant, the hiring party, was acquitted of the same murder for hire specification." Maj. Op. at 14. The majority reaches this conclusion not by citing to cases from the Supreme Court or this court that compel such a holding, but instead by attempting to distinguish one-by-one the binding precedents that I believe refute the arguments eventually adopted by the

majority. Our role under AEDPA, however, is *not* to show the absence of prior authority precluding recognition of the right at issue, but instead to determine whether that right has *already* been clearly established. *See* 28 U.S.C. § 2254(d)(1) (setting forth the applicable standard of review).

In my view, the answer to that inquiry in the present case is rather straightforward. The majority has not cited a single case in which the Supreme Court has declared an otherwise lawful death sentence imposed upon a defendant unconstitutional on the ground that another participant in the murder did not receive the death penalty. When combined with the fact that this court has never applied the now-repudiated common-law rule of consistency to defendants tried separately, the absence of Supreme Court caselaw supporting Getsy's proportionality argument is fatal to his claims for relief. In support of my conclusion, I have set forth below why I believe that the majority's holding runs counter to, or at the very least would require a considerable expansion of, federal law as interpreted by both the Supreme Court and this court.

## A.       *Teague*'s principle of nonretroactivity

As a general principle, federal habeas corpus petitioners "may not avail themselves of new rules of criminal procedure" per the Supreme Court's decision in *Teague v. Lane*. *See Beard v. Banks*, 542 U.S. 406, 408 (2004). The Court has explained that deciding "whether a constitutional rule of criminal procedure applies to a case on collateral review involves a three-step process." *Id.* at 411. This process begins with a court's determination of

> when the defendant's conviction became final. Second, it must ascertain the legal landscape as it then existed, and ask whether the Constitution, as interpreted by the precedent then existing, compels the rule. That is, the court must decide whether the rule is actually "new." Finally, if the rule is new, the court must consider whether it falls within either of the two exceptions to nonretroactivity.

*Id.* (citations and quotation marks omitted). This three-step analysis reveals that the rule announced by the majority is "new" and therefore unavailable to Getsy in this habeas corpus proceeding.

There is no question that Getsy's conviction became final when the Supreme Court denied his petition for certiorari in June of 1999. *See Getsy v. Ohio*, 527 U.S. 1042 (1999). I will thus turn to the second step in the *Teague* analysis—the determination of "whether the Constitution, as interpreted by the precedent [existing in 1999], compels the rule" adopted by the majority. *See Beard*, 542 U.S. at 411.

In my view, there are three reasons why the rule announced by the majority is a "new rule" under *Teague*. First, the majority revives the rule of consistency, whose reach has been severely limited (if not completely abolished) by the Supreme Court and whose application to defendants tried separately has been explicitly rejected by this court. The second reason is that the majority's inconsistent-verdict rule incorrectly construes the Supreme Court's proportionality precedents. These precedents examine whether capital punishment is proportionate to the criminal offense at issue, *not* whether one criminal's sentence is proportionate to those received by other offenders. Finally, the rule vastly expands the reach of the Court's fractured decision in *Furman v. Georgia*, 408 U.S. 238 (1972). I will address each of these reasons in turn.

### 1.       *The rule of consistency*

As stated above, the majority bases its decision to vacate Getsy's sentence in part on the common-law rule of consistency, which it says "prohibited a jury's acquittal of all but one of multiple defendants charged with jointly committing a crime that requires at least two participants." Maj. Op. at 11. A helpful starting point in analyzing the majority's rationale is the Supreme Court's most recent treatment of the rule of consistency in *United States v. Powell*, 469 U.S. 57 (1984). In

*Powell*, the Court reaffirmed the validity of its previous decision in *Dunn v. United States*, 284 U.S. 390 (1932), in which it had "held that a criminal defendant convicted by a jury on one count could not attack the conviction because it was inconsistent with the jury's verdict of acquittal on another count." *Powell*, 469 U.S. at 58. The defendant in *Powell* was convicted of using a telephone in conspiring to distribute and possess cocaine, but was acquitted of conspiring to knowingly and intentionally possess cocaine with the intent to distribute it. *Id.* at 60. Rejecting Powell's argument that the verdicts were impermissibly inconsistent, the Court unanimously endorsed the proposition that the rationale underlying a jury's verdict is unreviewable. *Id.* at 64-65. In so doing, the Court explained that inconsistent verdicts "often are the product of jury lenity"—a result that the government cannot appeal because of double jeopardy principles—and that appellate review of the sufficiency of the evidence provided a sufficient "safeguard[] against jury irrationality." *Id.* at 67.

The majority acknowledges that all but one of the courts of appeals to face this issue have read *Powell* as precluding application of the rule of consistency. Maj. Op. at 11 n.4, 13. Among those courts is the Sixth Circuit, which has addressed the continuing viability of the rule of consistency on three separate occasions. *See United States v. Newton*, 389 F.3d 631, 636 (6th Cir.), *vacated in part on other grounds*, 126 S. Ct. 280 (2005); *United States v. Crayton*, 357 F.3d 560, 565-67 (6th Cir. 2004); *United States v. Sachs*, 801 F.2d 839, 845 (6th Cir. 1986).

This court first addressed the status of the rule of consistency in *Sachs*, a case in which Sachs and a codefendant were charged with a conspiracy to infringe the copyrights of two popular films. *Id.* at 841. Sachs argued that, because the charges against his alleged coconspirator were dismissed before trial, his guilty verdict on the conspiracy count must be reversed. Without discussing *Powell*, this court held that the rule of consistency did not apply where "coconspirators are tried separately," adopting the Eleventh Circuit's view that the fact that "the evidence was insufficient to support a guilty verdict in the one case does not mean that conviction on different evidence in another case was improper." *Id.* at 845 (quoting *United States v. Roark*, 753 F.2d 991, 996 (11th Cir. 1985)). The court concluded that the same was true in cases where charges against a coconspirator were dismissed before trial, meaning that Sach's conviction could stand. *Sachs*, 801 F.2d at 845.

In the two more recent cases, this court has squarely held that the rule of consistency did not survive the Supreme Court's decision in *Powell*. *See Newton*, 389 F.3d at 636; *Crayton*, 357 F.3d at 565-67. The *Crayton* court addressed the question at length, analyzing the *Powell* decision and the response of our sister circuits to that decision. *Id.* at 565-66 (citing cases from the First, Fourth, Fifth, Ninth, and Eleventh Circuits that read *Powell* as "render[ing] the rule of consistency no longer good law"); *see also United States v. Morton*, 412 F.3d 901, 904 (8th Cir. 2005) (confirming, after this court's ruling in *Crayton*, that the Eighth Circuit reads *Powell* as barring reversal of "a conviction of one defendant [because it] is inconsistent with a verdict of acquittal of another defendant on the same count"). Rejecting the contrary view of the Tenth Circuit, this court held that "the rule of consistency previously recognized in this circuit did not survive *Powell*." *Crayton*, 357 F.3d at 566-67 (refusing to follow *United States v. Suntar Roofing, Inc.*, 867 F.2d 469, 475 (10th Cir. 1990)) (quotation marks omitted). The defendant's conviction for conspiracy to possess cocaine was therefore upheld, even though the jury had acquitted his only coconspirator of the same offense. 357 F.3d at 562.

*Crayton*'s principal holding was reaffirmed just last year in *Newton*, 389 F.3d at 636. Like his counterpart in *Crayton*, the defendant in *Newton* was convicted of conspiring to possess illegal drugs with the intent to distribute them. *Id.* at 633. His only alleged coconspirator, a man named Tim Wilson, was acquitted on the conspiracy charges in a separate trial. *Id.* at 634. Newton argued on appeal that his conviction was void under the rule of consistency because Wilson's acquittal left Newton as the sole remaining conspirator, and a person cannot conspire with himself. Citing *Crayton*, this court stated that "the rule of consistency has no continuing validity." *Id.* at 636. Without the rule, "Newton [could] be convicted of conspiring with Wilson despite Wilson's

acquittal." *Id.*; *see also id.* at 639 (Moore, J., concurring in part and dissenting in part) (expressing agreement "with the majority's resolution of Newton's claim[] as to the sufficiency of the evidence," which included the analysis of the rule of consistency). The clear import of these cases is that, in this circuit and in others, defendants cannot seek to overturn conflicting jury verdicts on the basis of the rule of consistency. This is most definitely the law of the circuit and not, as the majority struggles to show, simply "dicta" that can be disregarded. Maj. Op. at 14.

Furthermore, this court has *never* applied the old rule of consistency to invalidate conflicting verdicts returned by juries in separate trials. *See Newton*, 389 F.3d at 636 (noting that the rule of consistency "was not applied if co-conspirators were separately tried") (citing *Sachs*, 801 F.2d at 845); *see also* Michelle Migdal Gee, *Prosecution or Conviction of One Conspirator as Affected by Disposition of Case Against Coconspirators*, 19 A.L.R. 4th 142, § 3[b] (2005) (collecting cases). The very law review article on which the majority relies makes this point explicitly and convincingly:

> When the inconsistent verdicts come from different juries in successive trials, see, e.g., *Standefer v. United States*, 447 U.S. 10, 11-13 (1980), there is no true inconsistency. . . . A truly inconsistent verdict, as I am defining it . . . , is one that not only clashes with the logic of another verdict, but that also does so in a way that reveals jury error. When two juries reach verdicts that conflict with each other, the result may be uncomfortable. Indeed, it may be difficult to square with our traditional concern for the appearance of justice. But the inconsistency does not confirm that either jury reached its verdict improperly. That is a crucial distinction. Without any reason to think that either jury was acting erroneously, we have no reason to view either verdict with suspicion.

Eric L. Muller, *The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts*, 111 Harv. L. Rev. 771, 780 n.43 (1998). Therefore, even if the majority were correct in limiting the reach of the *Powell* decision, and even if we were not bound by this court's decisions in *Clayton* and *Newton*, the rule of consistency would still not apply in the present case, where the conflicting verdicts were rendered in separate trials.

Finally, I see nothing in the Supreme Court's earlier decisions in *Morrison v. California*, 291 U.S. 82 (1934), or *Hartzel v. United States*, 322 U.S. 680 (1944), that alters the interpretation of *Powell* that this court has recently adopted. Both *Morrison* and *Hartzel* stand for the unexceptionable proposition that, where a court declares that the evidence is insufficient to support one defendant's conspiracy conviction, the conviction of the only other party to the conspiracy must also be voided. *See Morrison*, 291 U.S. at 93; *Hartzel*, 322 U.S. at 682 n.3; *see also United States v. Bucuvalas*, 909 F.2d 593, 596 (1st Cir. 1990) (citing *Morrison* as support for the principle "that where the evidence against all of an individual's alleged co-conspirators is deemed legally insufficient, the evidence against that individual is by definition also insufficient").

A court's finding that the evidence was legally insufficient to support a conviction, however, is not the same as a jury's refusal to convict. This proposition is fully consistent with *Powell*, where the Supreme Court explained that appellate review of the sufficiency of the evidence is the primary bulwark against irrational jury verdicts. *See Powell*, 469 U.S. at 67. Read together, then, *Morrison*, *Hartzel*, and *Powell* reaffirm that the evaluation of the sufficiency of the evidence proffered at trial is the exclusive means of safeguarding against verdicts that, while apparently irreconcilable, may be nothing more than the product of jury leniency or nullification and are not appealable by the government. *See id.* at 66-67; *Bucuvalas*, 909 F.2d at 597 (opining that "the Court's emphasis in *Powell* on the sufficiency of the evidence fully embraces the *Hartzel* ruling").

### 2.      *Comparative proportionality*

Although the rule of consistency is not a principle rooted in the Eighth Amendment, the majority elsewhere in its opinion reveals that its true concern is that Getsy's death sentence is "disproportionate" to the sentence imposed upon the "mastermind" of the conspiracy to murder the Serafinos—namely, Santine. Maj. Op. at 8. But the Supreme Court's proportionality jurisprudence, contrary to the majority's view, focuses on whether the punishment of death is appropriate for specific types of criminal conduct, *not* on whether one defendant's death sentence is morally justifiable with respect to that of another participant in the same crime.

Proportionality, as the Supreme Court has explained, refers "to an abstract evaluation of the appropriateness of a sentence for a particular crime." *Pulley v. Harris*, 465 U.S. 37, 42-43 (1984). Evaluating the nature of the offense and the penalty, as well as sentencing practices in various jurisdictions, the "Court has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime." *Id.* at 43. Examples of "inherently disproportionate punishments" that are set forth in *Pulley* include a death sentence for the rape of an adult woman that does not result in death, and a death sentence for a defendant who aids and abets the commission of a felony but does not take life, attempt to take life, or intend to take life. *Id.* (citing *Enmund v. Florida*, 458 U.S. 782 (1982), and *Coker v. Georgia*, 433 U.S. 584 (1977) (plurality opinion)). These are the very examples seized on by Getsy, who argues in his brief that his sentence "is disproportionately severe in comparison to the sentences imposed on all of the other participants as well as others similarly situated."

But the Court in *Pulley* expressly rejected the argument that Getsy is making (and that the majority appears to accept)—namely, that the Constitution requires "comparative proportionality review." *See* 465 U.S. at 51. This type of review, the Court observed, "purports to inquire . . . whether the penalty is . . . unacceptable in a particular case because [it is] disproportionate to the punishment imposed on others convicted of the same crime." *Id.* at 43. Even though a comparative proportionality review is not constitutionally required, the Ohio Supreme Court conducts such reviews. This court has repeatedly upheld the Ohio Supreme Court's review procedures as falling "within the wide latitude allowed" states in defining the type of cases used for comparison. *See Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003) (rejecting the habeas petitioner's "claim that the Ohio Supreme Court failed to grant him meaningful proportionality review of his death sentence"); *Buell v. Mitchell*, 274 F.3d 337, 368-69 (6th Cir. 2001) (rejecting the habeas petitioner's "contentions regarding inadequate appellate review of the proportionality of death sentences under the Ohio statute . . . because no proportionality review is constitutionally required"). Getsy's proportionality argument is thus foreclosed by both our own precedents and those of the Supreme Court.

Nothing in the Supreme Court's decision in *Enmund v. Florida*, 458 U.S. 782 (1982), is to the contrary. The defendant in *Enmund* was the getaway driver for two others who had robbed and murdered an elderly couple. *Id.* at 784. He was convicted of two counts of first-degree murder and one count of robbery, and was sentenced to death. The Supreme Court granted certiorari to decide "the question whether death is a valid penalty . . . for one who neither took life, attempted to take life, nor intended to take life." *Id.* at 787. In answering that question, the Court reaffirmed that it was not deciding "the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmund's own conduct." *Id.* at 798. Continuing its analysis, the Court reiterated that "[t]he focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on individualized consideration as a constitutional requirement in imposing the death sentence[.]" *Id.* (citation and quotation marks omitted) (emphasis in original).

The Supreme Court then held that, because "Enmund did not kill or intend to kill," his culpability was insufficient to support a sentence of death under the Eighth Amendment. *Id.* In other words, death is a disproportionate penalty for defendants who do not take life, attempt to take life, or intend to take life. *See id.* at 787, 801. At no point in its opinion did the Court say that the Eighth Amendment requires state and federal courts to compare the conduct of one defendant to that of a codefendant involved in the same crime. Indeed, the Court's lone reference to the conduct of Enmund's codefendants was in the context of differentiating between criminals who *do* take life (or intend to take life) and those, like Enmund, who do not. *See Tison v. Arizona*, 481 U.S. 137, 149 (1987) (reading *Enmund* as resting on the fact that Enmund's "own participation in the felony murder was so attenuated" and that "there was no proof that Enmund had any culpable mental state," and so limiting the *Enmund* holding). *Enmund*, in sum, held nothing more and nothing less than that states may not impose the death penalty on defendants who do not kill, attempt to kill, or intend to kill a human being—the precise question on which the Court granted review.

The majority's reading of *Enmund* turns that case on its head. First, the narrow holding of *Enmund* cuts decisively against Getsy, since he took Ann Serafino's life and thus falls squarely within the class of offenders for whom death *is* a permissible punishment. More importantly, the Supreme Court stated in *Edmund* what it would go on to reaffirm in *Pulley*—that what the Constitution requires is "individualized consideration" of a defendant's culpability, "which means that [courts] must focus on relevant facets of the character and record of the individual offender." *Id.* at 798 (citations and quotation marks omitted). The focus in *Edmund* was "on *his* culpability, not on that of those who committed the robbery and shot the victims[.]" *Id.* (emphasis in original). Similarly, the focus in the present case must be on Getsy, *not* on Santine or any of the others who participated in the conspiracy to murder the Serafinos. Rather than supporting the majority's creation of a comparative-proportionality requirement, therefore, the decision in *Enmund* reinforces the proposition at the heart of *Pulley*—that the Eighth Amendment assures that the punishment will fit the crime, but does not bar one defendant in a murder conspiracy from receiving a death sentence simply because another of the coconspirators received a life sentence.

Just as mystifying to me is the majority's reliance on the writings of Aristotle, a law review article that also cites Aristotle, and three state-court decisions discussing proportionality as a matter of *state* constitutional law. Maj. Op. at 9-10. These authorities, needless to say, stray far from the only source of law that permits us to invalidate a state-court ruling and grant habeas relief—the decisions of the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

Moreover, the state-court cases cited by the majority, even if they were valid sources of law for a federal habeas court to consider, provide little support for the majority's holding. In one of those cases, *People v. Kliner*, 705 N.E.2d 850, 897-98 (Ill. 1998), the state court *affirmed* the death sentence of a hired killer, even though the person who had hired him had pled guilty and received a 60-year term of imprisonment. The Florida Supreme Court in *Larzelere v. State*, 676 So. 2d 394, 406 (Fla. 1996), likewise *affirmed* the death sentence in the converse situation—one where a mother who hired her son to kill her husband was convicted of capital murder, but the son was acquitted of the murder charge in a subsequent trial. Finally, the one case of the three in which a state court actually overturned a sentence as disproportionate *under state law* predated the Supreme Court's decision in *Enmund* and explicitly reaffirmed the validity of its prior decisions upholding death sentences imposed on one "but not necessarily all of the participants in a criminal transaction." *Hall v. State*, 244 S.E.2d 833, 839 (Ga. 1978). These decisions demonstrate that even those state courts that conduct a comparative proportionality review of the type endorsed by the majority have upheld death sentences despite apparently inconsistent verdicts rendered in separate trials.

Furthermore, I read the Supreme Court's decision in *McCleskey v. Kemp*, 481 U.S. 281 (1987), as resolving any remaining doubt as to the viability of comparative-proportionality challenges. The defendant in *McCleskey* was a black man convicted of killing a white police officer.

After he was sentenced to death, McCleskey argued that his sentence violated the Eighth Amendment. McCleskey relied on statistical evidence of "a disparity in the imposition of the death sentence in Georgia based on the race of the murder victim and, to a lesser extent, the race of the defendant." *Id.* at 286. He also maintained "that the sentence in his case is disproportionate to the sentences in other murder cases." *Id.* at 306. Citing *Pulley*, the Supreme Court rejected McCleskey's challenge and upheld his death sentence. McCleskey, the Court explained, could not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *Id.* at 306-07 (emphasis in original). The Court reasoned that the possibility that juries in other cases may have acted out of "discretionary leniency" and declined to impose the death penalty did not render death sentences that were imposed "arbitrary and capricious." *Id.* at 307.

In rejecting McCleskey's comparative proportionality argument, the Supreme Court appended a lengthy footnote to explain why "[t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime." *Id.* at 307 n.28. The Court elaborated:

> Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt. If sufficient evidence to link a suspect to a crime cannot be found, he will not be charged. The capability of the responsible law enforcement agency can vary widely. Also, the strength of the available evidence remains a variable throughout the criminal justice process and may influence a prosecutor's decision to offer a plea bargain or to go to trial. Witness availability, credibility, and memory also influence the results of prosecutions. Finally, sentencing in state courts is generally discretionary, so a defendant's ultimate sentence necessarily will vary according to the judgment of the sentencing authority. The foregoing factors necessarily exist in varying degrees throughout our criminal justice system.

*Id.* These practical difficulties inherent in reviewing discretionary sentencing decisions mirror the concerns expressed by the Court when it rebuffed a challenge to seemingly inconsistent jury verdicts in *Powell*. *See* 469 U.S. at 64-67. As the Court noted in both *Powell* and *McCleskey*, the power of the jury to express "the collective judgment of the community" through a compromise verdict or the exercise of mercy may lead to imperfect outcomes, but they are outcomes that are just as likely to benefit criminal defendants as to prejudice them. *See id.* at 67; *McCleskey*, 481 U.S. at 307.

The majority's proportionality holding, as applied in this case, leads to exactly the type of "imprudent and unworkable" results that the Supreme Court warned against in *Powell*. *See* 469 U.S. at 66. Without intending a parade of horribles, I offer two examples that I believe demonstrate the illogical consequences to which the majority's rule leads. Assume that, unlike in the present case, the jury did not find the murder-for-hire specification and recommended that Getsy be sentenced to life in prison. The majority's rule would appear to prevent the state, at the subsequent trial of Santine, from seeking the death penalty on the basis of murder for hire, since Santine could point to the jury verdict in Getsy's case and allege inconsistency. Alternatively, what if Santine had fled the jurisdiction and was not located and brought to trial until well after Getsy's conviction or, worse still, until after Getsy was executed? If the jury at his much-later trial failed to find the murder-for-hire specification, would Getsy's death sentence become unconstitutional years after the fact? These examples, which are just two of many that one could posit, expose as "imprudent and unworkable" a rule that makes the validity of one person's conviction and sentence contingent upon the verdict of another jury at the later trial of his or her "partner in crime."

Beyond these practical concerns, caselaw from our sister circuits provides a strong indication that the majority's proportionality theory runs directly counter to the Supreme Court's holdings in *McCleskey* and *Pulley*. The Tenth Circuit, for example, has rejected under similar factual

circumstances the same comparative proportionality argument advanced by Getsy and endorsed by the majority. *See Hatch v. Oklahoma*, 58 F.3d 1447, 1466 (10th Cir. 1995). In *Hatch*, the defendant's accomplice, Glen Burton Ake, entered the home of Richard and Marilyn Douglass by pretending that he was lost and requesting directions from the Douglasses. *Id.* at 1451. Ake then retrieved a firearm from the car, and he and Steven Hatch reentered the home, both armed. *Id.* The duo bound and gagged Richard and Marilyn, as well as their son Brooks, and attempted to rape the Douglasses' 12-year-old daughter. *Id.* Ake then told Hatch to return to the car, to prepare it for their departure, and to "wait for the sound." *Id.* After Hatch left the house, Ake shot each of the Douglasses, killing the parents and wounding both children.

The two defendants were tried separately. Hatch waived his right to a jury trial, while Ake availed himself of that right. After various appeals, Hatch was sentenced to death, and the Oklahoma state courts affirmed. *Id.* at 1452. Ake's case eventually reached the United States Supreme Court, which reversed his conviction and remanded for a new trial. *Ake v. Oklahoma*, 470 U.S. 68, 74 (1985). The jury at the second trial convicted Ake of first-degree murder and shooting with intent to kill, but recommended a life sentence, which the trial judge imposed. *See Ake v. State*, 778 P.2d 460, 461-62 (Okla. Crim. App. 1989).

Before the Tenth Circuit, Hatch argued "that the Constitution require[d] that he receive a sentence proportional to others who have committed the same offense." *Hatch*, 58 F.3d at 1466. Hatch maintained that, because Ake was "more culpable for the murders," Hatch's "sentence should be no more severe than his codefendant," who received life imprisonment. *Id.* at 1466 & n.14. The Tenth Circuit acknowledged that the Supreme Court's decision in *Pulley* had directly dealt with "appellate court review for proportionality in relation to *all* defendants." *Id.* at 1466 (emphasis in original). What Hatch sought was slightly different—"a proportionality review of his sentence relative only to his codefendant." *Id.* The Tenth Circuit found this distinction irrelevant for constitutional purposes, concluding that *Pulley* foreclosed Hatch's challenge. Hatch, the court held, "was constitutionally entitled to a determination of his individual culpability, and he received that individualized consideration. The Constitution does not demand that he receive a review of his comparative responsibility as well." *Id.* (citation omitted); *see also Bush v. Singletary*, 99 F.3d 373, 375 (11th Cir. 1996) (per curiam) (holding that a successive habeas petitioner did not raise a federal constitutional claim by arguing that his death sentence was disproportionate to that of his codefendant, whose death sentence had been vacated on appeal); *Russell v. Collins*, 998 F.2d 1287, 1294 (5th Cir. 1993) (denying relief to a habeas petitioner who argued that his death sentence was disproportionate to that of a codefendant who had pled guilty and had been sentenced to 60 years in jail).

Similarly, both the jury and the Ohio courts on appellate review have provided Getsy with "a determination of his individual culpability." *Hatch*, 58 F.3d at 1466. They have concluded that Getsy shot and killed Ann Serafino, that the evidence supports the finding of three specifications (murder for hire, felony murder, and attempting to kill two or more persons), and that the aggravating circumstances outweigh the mitigating ones. The Ohio Supreme Court, employing a type of proportionality review that this court has upheld, *see Buell*, 274 F.3d at 368-69, also found that Getsy's sentence was not disproportionate to those imposed on others convicted of similar crimes and sentenced to death. *See State v. Getsy*, 702 N.E.2d 866, 892 (Ohio 1998).

Nothing more is required by the Constitution. *See McCleskey*, 481 U.S. at 306 (reaffirming *Pulley*'s holding that comparative "proportionality review is not constitutionally required"); *see also Hatch*, 58 F.3d at 1466 (citing cases from the Fourth, Fifth, and Eighth circuits agreeing that comparative proportionality review is not constitutionally mandated). Because comparative proportionality review is not constitutionally required, and because the Supreme Court and our sister circuits have rejected a proportionality argument substantially similar to the one advanced by Getsy, I believe that the majority has erred in adopting a contrary position.

The majority has responded to my discussion of proportionality by arguing that this court's precedents upholding the Ohio Supreme Court's system of proportionality review against constitutional challenges do not control in the present case because Getsy "does not challenge Ohio's system of proportionality review." Maj. Op. at 10 n.2. Rather, the majority says, Getsy is challenging only the application of that system to his case. *Id.* I find this response unconvincing for two reasons. First, the majority is wrong as a matter of fact. Getsy spends approximately five pages in his appellate brief attacking the validity of Ohio's system of proportionality review. (Appellant's Br. at 120-125) Second, even if Getsy is challenging only the application of the proportionality review scheme to his case (as opposed to the constitutionality of the system as a whole), the majority has misconceived the import of this court's precedents.

The cases of *Williams*, *Wickline*, *Smith*, and *Buell* all uphold a particular type of proportionality review conducted by the Ohio Supreme Court, which compares the individual death sentence at issue with "previous cases in which the death penalty has been imposed." *Wickline*, 319 F.3d at 824-25. That is to say, the Ohio Supreme Court specifically excludes from the precedents used for comparison those cases in which defendants, like Santine, received a sentence of life imprisonment. But what the majority holds, in essence, is that the Ohio Supreme Court unreasonably applied clearly established federal law by refusing to conclude that Getsy's sentence is disproportionate to the one received by Santine, even though this court has consistently held that the Ohio Supreme Court is not obligated to consider the life sentence of a coconspirator *at all*. I cannot accept the notion that a state court's failure to consider something that this court has repeatedly said that it need not consider can constitute reversible constitutional error and serve as the basis for habeas corpus relief.

To sum up, I believe that the rule announced by the majority is a new rule of constitutional law that conflicts with Supreme Court precedents rejecting substantially similar arguments. Caselaw from both this court and our sister circuits confirms that the only type of proportionality review mandated by the Constitution is an evaluation of "the appropriateness of a sentence for a particular crime," not the appropriateness of a sentence relative to the one received by other participants in the crime. *See Pulley*, 465 U.S. at 42-43. Nothing cited by the majority persuades me otherwise. I thus believe that the decision that is contrary to clearly established federal law is not the one rendered by the Ohio Supreme Court, but that of the majority today.

### 3.      *Inconsistent verdicts at separate trials do not implicate* **Furman**

The majority further asserts, without support, that the common-law rule of consistency informs the inquiry into whether a death sentence is unconstitutionally arbitrary under *Furman v. Georgia*, 408 U.S. 238 (1972). Maj. Op. at 6, 15. *Furman* was a fractured 5-4 decision by the Supreme Court that effectively created a temporary moratorium on capital punishment in the United States. No single rationale united the five justices who found the death penalty as then administered "cruel and unusual" within the meaning of the Eighth Amendment, and subsequent decisions of the Court demonstrate that the majority's reliance on *Furman* is unavailing as a basis to set aside Getsy's sentence.

One way in which I believe that the majority misconceives the significance of *Furman* is by failing to acknowledge the manner in which the Supreme Court has subsequently interpreted its decision in that case. In *Gregg v. Georgia*, 428 U.S. 153 (1976), for example, the Court upheld the constitutionality of Georgia's death penalty system—a modified version of the system that it had declared unconstitutional in *Furman*. The petitioner in *Gregg* challenged, on the strength of *Furman*, the continued chance that the discretionary nature of the Georgia system would result in the arbitrary imposition of the death penalty in murder cases. But the Court rejected this argument, describing *Furman* as holding "only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided

by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Id.* at 199 (joint opinion of Stewart, Powell, and Stevens, JJ.); *see also Blystone v. Pennsylvania*, 494 U.S. 299, 314 (1990) ("In *Furman*, the Court held that vesting the sentencer with unbridled discretion to determine whether or not to impose the death penalty resulted in a system in which there was no objective way to distinguish between defendants who received the death penalty and those who did not.").

The jury at the sentencing phase of Getsy's trial "focus[ed] on the particularized circumstances of the crime and the defendant," *Gregg*, 428 U.S. at 199 (joint opinion of Stewart, Powell, and Stevens, JJ.), and the majority does not contend otherwise. Nor does the majority claim that Ohio's capital punishment system "vest[ed] the sentencer with unbridled discretion to determine whether or not to impose the death penalty" in his case. *Blystone*, 494 U.S. at 314. Such claims would in any event be contrary to both law and fact because Ohio's sentencing regime requires the jury to find statutory aggravating factors before it can impose the death penalty, and to weigh those factors against any mitigating circumstances, which is exactly what the jury did in the present case.

I also believe that the majority misconceives the applicability of *Furman* in two other ways. One is its failure to recognize that *Furman* focused not on the unfairness or arbitrariness of individual death sentences, but on the arbitrariness of state capital-punishment regimes as a whole. *See Gregg*, 428 U.S. at 200 (joint opinion of Stewart, Powell, and Stevens, JJ.) ("[T]he petitioner looks to the sentencing system as a whole (as the Court did in *Furman* and we do today) and argues that it fails to reduce sufficiently the risk of arbitrary infliction of death sentences."). Even the justices most ardently opposed to the death penalty believed that what rendered the regime unconstitutional was its systematic irrationality, not the unjust outcome in a particular case. *See, e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 323 (1987) (Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ., dissenting) (stating that "concern for arbitrariness focuses on the rationality of the system as a whole"). Because the Court's decision in *Furman* rested primarily on concerns about the irrationality of state capital-sentencing regimes "as a whole," I disagree with the majority's characterization of that case as focusing on inconsistent results in individual cases. Maj. Op. at 7-8.

The other way in which I believe the majority misinterprets *Furman* is by incorporating the rule of consistency, as well as the Supreme Court's decisions in *Morrison* and *Hartzel*, into *Furman*'s Eighth Amendment principles. Maj. Op. at 13-15. According to the majority, the rule of consistency and *Morrison*/*Hartzel* "add[] clarity, detail, and content to the more generalized 'arbitrariness' language of *Furman*." Maj. Op. at 13. I fail to see, however, how cases decided 28 and 38 years prior to *Furman* can be used to clarify the Court's later decision. Instead, I would look to the Court's more recent interpretations of the Eighth Amendment, all of which, as I have shown above, substantially limit the reach of *Furman*. I therefore believe that the majority errs in giving an expansive reading to *Furman*, and that it has created a new rule of constitutional law in doing so.

### 4.     *The majority's rule does not fall within the exceptions to* **Teague**

Because none of the Supreme Court cases cited by the majority "compel" the constitutional rule that it adopts today, that rule is a "new" one that cannot benefit Getsy in his collateral attack on his state conviction and sentence unless "it falls under one of *Teague*'s exceptions." *See Beard v. Banks*, 542 U.S. 406, 411, 416 (2004). Those narrow exceptions are for (1) "rules forbidding punishment of certain primary conduct [or] rules prohibiting a certain category of punishment for a class of defendants because of their status or offense," and (2) "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* at 416-17 (citations and quotation marks omitted).

Neither Getsy's "status" nor the nature of his criminal offense form the basis for the majority's rule, so the first exception does not apply. *See id.* As for the second exception, the Court

in *Beard* "emphasized the limited scope" of the exception, noting that it had "yet to find a new rule that falls under the second *Teague* exception," *id.* at 417, which includes only those procedural protections as fundamental to the system of criminal justice as the right to counsel. The rule announced by the majority, unlike the right to counsel, is not one that transforms the courts' "understanding of the *bedrock procedural elements* essential to the fairness of a proceeding," *id.* at 418 (citation omitted) (emphasis in original). *Teague*'s limited second exception, therefore, is similarly inapplicable.

That the majority's rule aims to avoid "potentially arbitrary impositions of the death sentence" does not alter either the analysis or the outcome. *Id.* at 419. Indeed, the *Beard* Court specifically rejected the argument that rules with such an objective automatically fall under the second *Teague* exception. The Court explained that all of its Eighth Amendment jurisprudence in the capital-punishment context "is directed toward the enhancement of reliability and accuracy in some sense," but nonetheless held that "the fact that a new rule removes some remote possibility of arbitrary infliction of the death sentence does not suffice to bring it within *Teague*'s second exception." *Beard*, 542 U.S. at 419-20 (citation and quotation marks omitted). Because I believe that the majority's holding constitutes a new rule of constitutional law, and because that rule does not fall within either of the narrow exceptions to *Teague*'s principle of nonretroactivity, I would deny Getsy any relief on the basis of that rule.

## B.        AEDPA standard

As the majority acknowledges, Getsy must also demonstrate that the decision of the Ohio Supreme Court is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A legal principle is clearly established only if it constitutes an "old rule" under *Teague*. *See id.* at 412 (explaining that "whatever would qualify as an old rule under [the Court's] *Teague* jurisprudence will constitute clearly established Federal law . . . under § 2254(d)(1)") (quotation marks omitted). For the reasons set forth above, I believe that the majority's rule is new, rather than old, and that the questionable principle announced today does not constitute clearly established federal law.

To the extent that the majority relies on the fact that the Supreme Court has not squarely *rejected* the rule adopted today, that fact admits to the inconsistency of the majority's holding with the requirements of AEDPA because it demonstrates that the Court has not yet addressed the issue. The majority insists that relevant Supreme Court "precedents include not only bright-line rules but also the legal principles and standards flowing from precedent." Maj. Op. at 5 (quoting *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005)). But whatever the breadth of those "legal principles and standards" may be, this court has held that "[t]he Supreme Court's silence on a particular issue cannot constitute 'clearly established' Federal law." *Hill v. Hofbauer*, 337 F.3d 706, 712 n.3 (6th Cir. 2003); *see also Taylor v. Withrow*, 288 F.3d 846, 855 (6th Cir. 2002) (Boggs, J., concurring) (opining that "the silence of the Supreme Court may not be construed as clearly established law sufficient to allow a federal court to reverse a state determination").

Even if the Supreme Court's unanimous decision in *Powell* did not signal the death knell for the rule of consistency, and even if *McCleskey* and *Pulley* did not definitively reject the idea of comparative proportionality review, all the majority can say is that the Court has not yet spoken to the rule articulated today. But this court's cases make abundantly clear that the Supreme Court's silence on an issue is simply not enough to reverse a state-court decision under AEDPA. I therefore believe that the majority has erred in granting habeas relief on the basis of ambiguities that it perceives to exist (and I do not) in the Court's caselaw.

## II. EVIDENTIARY HEARING

I agree with the majority that Getsy made a reasonable attempt to develop the factual basis of his judicial-bias claim and that the strict requirements of AEDPA do not bar his pursuit of this issue. Maj. Op. at 17. Despite overcoming these initial hurdles, however, Getsy is not automatically entitled to an evidentiary hearing. *See Fullwood v. Lee*, 290 F.3d 663, 681 (4th Cir. 2002) ("[E]ven if [the petitioner's] claim is not precluded by § 2254(e)(2), that does not mean he is entitled to an evidentiary hearing—only that he *may* be.") (quoting *McDonald v. Johnson*, 139 F.3d 1056, 1059-60 (5th Cir. 1998) (alterations and emphasis in original). Getsy must instead satisfy the criteria contained in the Supreme Court's pre-AEDPA cases, principally its decision in *Townsend v. Sain*, 372 U.S. 293, 313 (1963), which sets forth six circumstances under which a federal court either may or must grant an evidentiary hearing upon the request of a state habeas petitioner. *See Cardwell v. Greene*, 152 F.3d 331, 338-39 (4th Cir. 1998) (holding that where § 2254(e)(2) does not bar a habeas petitioner's request for an evidentiary hearing, "the district court may proceed to consider whether a hearing is appropriate, or required under *Townsend*"), *overruled on other grounds by Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000).

But the six criteria listed in *Townsend* are relevant only if, as a threshold matter, "the petitioner alleges additional facts that, if true, would entitle him to relief." *Fullwood*, 290 F.3d at 681 (citation and quotation marks omitted); *see also Davis v. Lambert*, 388 F.3d 1052, 1061 (7th Cir. 2004) ("Under pre-AEDPA standards, a federal evidentiary hearing is required only if . . . the petitioner alleges facts which, if proved, would entitle him to relief . . . ."); *Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir. 2005) (same). Getsy must therefore point to facts that, if proved, would demonstrate that judicial bias on the part of the state-court trial judge violated his due process rights. *See Bracy v. Gramley*, 520 U.S. 899, 905 (1997) (explaining that "the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor" that "requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case") (citations and quotation marks omitted). I do not believe that Getsy has made such a showing.

Getsy's allegations focus on (1) Judge McKay's alleged contacts with Getsy's prosecutor at a party held at the home of the prosecutor's mother-in-law; and (2) Judge McKay's conduct in court the day after the party, when he arrived late and wore sunglasses in court. The first of these claims alleges the Judge McKay was biased because of his out-of-court friendship with the prosecutor, whereas the second claim appears to assert that the judge conducted the proceedings in a manner that strongly suggested to the jury that he favored the prosecution. *See Wallace v. Bell*, 387 F. Supp. 2d 728, 737 (E.D. Mich. 2005) (explaining the two types of judicial-bias claims, and granting habeas relief where the state-court trial judge called his own witness to bolster the prosecution's case and the state appellate court failed to recognize that judicial bias is a structural error).

As to his first claim, Getsy seeks the opportunity "to discover the names of other persons at the party or to depose such people." The thrust of Getsy's argument, as I understand it, is that Judge McKay must have been socializing with the prosecutor and therefore improperly discussed the pending case with her, or became so friendly with her as to favor the prosecution, or both. This court, however, has already held in a capital case that "ex parte contact does not, in itself, evidence any kind of bias." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002) (holding that the habeas petitioner's allegations that the state-court judge engaged in ex parte communications with jurors during the trial and with the family members of the victim "fail[ed] to present a viable claim of constitutionally-impermissible judicial bias," and did not entitle the petitioner to an evidentiary hearing). The Chief Justice of the Ohio Supreme Court reached the same conclusion in reviewing Getsy's motion to disqualify Judge McKay, observing that "[t]he mere fact that a judge and an

attorney attend the same social event does not mandate the judge's disqualification from pending cases involving that attorney." *In re Disqualification of McKay*, 674 N.E.2d 359 (Ohio 1996).

I agree with the district court that the decision of the Chief Justice, and the subsequent action of the Ohio Supreme Court in adopting his opinion, is not contrary to or an unreasonable application of clearly established federal law. Furthermore, I do not believe that Getsy's mere allegation that Judge McKay and the prosecutor are both lying and that they did in fact socialize extensively and/or discuss his case at the party entitles him to an evidentiary hearing on the issue. The Supreme Court reaffirmed in *Bracy* that courts ordinarily "presume that public officials have properly discharged their duties." 520 U.S. at 909 (citation and quotation marks omitted). To overcome that presumption, Getsy has offered nothing more than his suspicions that Judge McKay and the prosecutor had extensive contacts, such that Judge McKay developed a "judicial predisposition[] . . . beyond what is normal and acceptable." *Alley*, 307 F.3d at 386 (quoting *Liteky v. United States*, 510 U.S. 540, 552 (1994)).

An evidentiary hearing, however, should be held only where it "would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000) (Becker, C.J.). Far from being "meaningful," Getsy's plan to question people who attended a party a decade ago about their recollection of the interaction between Judge McKay and the prosecutor threatens to devolve into a fishing expedition that will contribute little if anything to his ultimate claim that Judge McKay denied him "the right to a fair trial in a fair tribunal." *Alley*, 307 F.3d at 386.

Getsy also fails to make a colorable showing that Judge McKay's behavior in court the day after the party and his automobile accident dropped below the "constitutional floor" of judicial conduct. *Bracy*, 520 U.S. at 904. As the *Bracy* Court emphasized, "most questions concerning a judge's qualifications to hear a case are not constitutional ones," but are instead "answered by common law, statute, or the professional standards of the bench and bar." *Id.* The Second Circuit, in reviewing allegations of misconduct on the part of a state-court trial judge, has similarly pointed out that "federal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts [but] lack such authority with respect to state courts. The only commands that federal courts can enforce in state courts are those of the Constitution." *Daye v. Attorney Gen. of New York*, 712 F.2d 1566, 1571 (2d Cir. 1983) (footnote omitted).

Judge McKay's regrettable actions outside the courtroom certainly violated Ohio law, as his drunk driving conviction demonstrates. His decision to continue the trial despite any lingering physical effects from his consumption of alcohol or the single-car accident may even have been so ill-advised as to fall below the "professional standards of the bench and bar." *Bracy*, 520 U.S. at 904. Getsy, however, has not pointed to any acts by Judge McKay in court following the accident that evince favoritism to the prosecution or that would have signaled to the jury that the judge was on the state's side. In other words, Getsy has not alleged any facts that, if true, would establish that the conduct of the trial judge violated Getsy's constitutional rights. *See Fullwood*, 290 F.3d at 681. Furthermore, the voir dire conducted by another judge revealed that only two jurors had even heard of Judge McKay's accident and arrest, and all of the jurors agreed that the judge's personal situation would not affect their disposition of the murder case. I do not believe, under these circumstances, that Judge McKay's refusal to recuse himself deprived Getsy of "a fair trial in a fair tribunal." *Bracy*, 520 U.S. at 904 (citation and quotation marks omitted).

Finally, even if Getsy's entitlement to an evidentiary hearing is a closer question than what I believe it to be, we should not be second-guessing the district court's refusal to conduct such a hearing unless that court abused its discretion. *See Abdus-Samad v. Bell*, 420 F.3d 614, 626 (6th Cir. 2005) (reciting that standard of review in affirming the denial of an evidentiary hearing). A district court abuses its discretion where it "applies the incorrect legal standard, misapplies the correct legal

standard, or relies upon clearly erroneous findings of fact." *United States v. Martinez*, 430 F.3d 317, 326 (6th Cir. 2005) (citation and quotation marks omitted). The majority, however, has not subjected Getsy's request for an evidentiary hearing either to the governing pre-AEDPA requirements or to the highly deferential abuse-of-discretion standard of review. For the reasons stated above, I do not believe that Getsy is entitled to an evidentiary hearing under the still-applicable pre-AEDPA standards, and I therefore cannot say that the district court "committed a clear error of judgment" in denying him the requested hearing. *Fair Intern. Exploration, Inc. v. The Captain Lawrence*, 245 F.3d 857, 861-62 (6th Cir. 2001) (applying the abuse-of-discretion standard in affirming the district court's denial of an evidentiary hearing) (citation and quotation marks omitted).

### III. REMEDY

I have set forth in Parts I and II above what I believe to be the majority's extraordinary departure from established law and the standard of review in habeas corpus cases. My final disagreement with the majority relates to the remedy prescribed. The majority "reverse[s] and vacate[s] the judgment below insofar as it leaves undisturbed the death sentence imposed," but then grants the state 180 days "to reconsider in light of this opinion Getsy's sentence under Ohio law." Maj. Op. at 20. This disposition, to say the least, leaves me puzzled—a reaction that I dare say the district court and state courts will share when trying to decipher how to proceed on remand. While purporting to give the state flexibility in resentencing Getsy, the majority has effectively placed the state in a straightjacket. *See* Maj. Op. at 18 n.7 ("[O]ur rule of consistency holding means that Getsy cannot face retrial on the murder for hire specification.").

For example, if the district court denies Getsy relief on his judicial-bias claim after the evidentiary hearing, must the court nevertheless issue an unconditional writ with respect to Getsy's death sentence? The answer, as I understand the majority opinion, is "yes." This is because further state proceedings cannot cure what the majority identifies as the constitutional defect—the failure of the jury at Santine's separate trial to find the murder-for-hire specification. In other words, Getsy might now be categorically ineligible for the death penalty even though the jury unanimously found beyond a reasonable doubt two other valid capital specifications (felony murder and attempting to kill two or more persons) that could have independently supported a death sentence.

I also assume that the same answer would be required even if the district court finds merit in Getsy's judicial-bias claim and conditionally grants habeas relief, subject to the state giving him a new trial. Normally the state on retrial could drop the murder-for-hire specification, charge Getsy with the other two capital specifications, and, if a jury convicts him of those specifications, carry out the death sentence. This plausible solution flows from the Supreme Court's directive that, "in the habeas context, state courts should be given an opportunity to remedy errors that occurred at the state level." *Bell v. Jarvis*, 198 F.3d 432, 444 (4th Cir.1999) (citing *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987)), *vacated on other grounds*, 236 F.3d 149 (4th Cir. 2000). But whether this course would be available in the present case remains unclear, since there is nothing that the state can do—short of declining to seek the death penalty—that would alter the verdict from Santine's separate trial.

If I am right in this assessment, then the majority has in effect granted an *unconditional* writ of habeas corpus with respect to the death sentence, because the state has no way to cure the problem created by the majority's new rule of comparative proportionality. The majority has thus constructively commuted Getsy's death sentence to a term of life imprisonment. But federal courts lack the power to do this in the exercise of their habeas jurisdiction. *See Duhamel v. Collins*, 955 F.2d 962, 968 (5th Cir. 1992) ("A federal court does not . . . have the authority to commute a death sentence to life imprisonment[.]") (citing *Fay v. Noia*, 372 U.S. 391, 430-431 (1963)); *see also Mapes v. Tate*, 388 F.3d 187, 194 (6th Cir. 2004) (cautioning that, "[a]lthough the death penalty

understandably evokes strong passions and emotions, the prevailing interests of federalism and comity demand that federal courts exercise restraint when issuing a writ of *habeas corpus*").

The majority has not cited any cases authorizing a remedy of this nature or scope. My review of the caselaw in this area has likewise revealed none. The types of cases in which federal courts grant unconditional writs that preclude corrective action are truly exceptional ones in which the constitutional provision at issue *itself* bars further proceedings. *See Cave v. Singletary*, 84 F.3d 1350, 1357-58 (11th Cir. 1996) (Kravitch, J., dissenting) (explaining that retrial or resentencing may be barred where the state violated the defendants' rights under the Double Jeopardy or Speedy Trial Clauses, or failed to produce constitutionally sufficient evidence). To the extent that the majority believes that the comparative-proportionality rule that it has created fits within one of these narrow exceptions, I disagree. Indeed, the possibility that the rule announced today would *require* a remedy of this nature cuts strongly against endorsing the rule in the first place.

## IV. CONCLUSION

Both the majority and the Ohio Supreme Court have expressed concern over the seemingly incongruous results from the separate trials of Getsy and Santine. I share their concern, recognizing at the same time that reasonable people can disagree over the relative moral turpitude of the instigator of an assassination on the one hand and the killer who he hired to carry out the violent act on the other. Nevertheless, I do not believe that I am empowered to answer this philosophical question by bypassing the limitations that both Congress and the Supreme Court have placed upon this court's power to grant relief under the circumstances of this case.

Perhaps some day the Supreme Court will hold that a comparison between the culpability of a murderer and that of his codefendant is constitutionally required, and that inconsistent verdicts arising from separate trials are unconstitutional. But this is not the law of the land today, and was obviously not the "clearly established law" at the time that the Ohio Supreme Court affirmed Getsy's conviction and sentence in 1999. For this reason, as well as the others set forth above, I do not believe that the judgment of the Ohio Supreme Court in this case is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. I would accordingly affirm the district court's denial of habeas relief on all of Getsy's claims. And because Getsy has not alleged any facts that, if true, would entitle him to relief on his claim of judicial bias, I do not believe that the district court abused its discretion in denying him an evidentiary hearing. I therefore respectfully dissent.